**KING COMMODITY COMPANY OF TEXAS, INC., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 18291.**

Court of Civil Appeals of Texas, Dallas.

March 7, 1974.

Rehearing Denied April 4, 1974.

Mark W. Perrin, Houston, for appellant.

John L. Hill, Atty. Gen. for the State of Texas, Bill Flanary, Asst. Atty. Gen., Austin, for appellee.

GUITTARD, Justice.

On this interlocutory appeal our questions are whether "commodity options" are "securities" subject to registration under the Texas Securities Act and whether a district court of a county other than that in which a corporation subject to the Texas Business Corporations Act has its registered office may appoint a receiver for the assets and business of the corporation.

The appeal comes from one of the district courts of Dallas County, which granted a temporary injunction restraining King Commodity Company of Texas, Inc., and its officers and employees from selling "commodity options" without first obtaining the registration and licenses required by the Texas Securities Act, Tex.Rev.Civ. Stat.Ann. arts. 581–7 and 581–12 (Vernon 1964). The court also found that defendant corporation, which had its registered office in Harris County, was in imminent danger of insolvency and appointed a temporary receiver to take over all its records and assets. We agree with the trial court that the options were "securities" subject to registration, but we hold that the district court of Dallas County had no authority to appoint a receiver for the corporation.

## I. SECURITIES SUBJECT TO REGISTRATION

"Securities" are defined in the Texas Securities Act, Tex.Rev.Civ.Stat.Ann. art. 581–4(A), as follows:

> The term "security" or "securities" shall include any share, stock . . . note, bond, debenture, mortgage certificate or other *evidence of indebtedness* . . . or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, *investment contract,* or any other instrument commonly known as a security, whether similar to those herein referred to or not. [Emphasis added.]

The State contends that the "commodity options" sold by defendants are both "evidence[s] of indebtedness" and "investment

contract[s]" within this definition. We agree.

### (1) *"Investment contract"*

The term "investment contract" appears to have been taken from § 2(1) of the Federal Securities Act of 1933, 15 U.S.C. § 77b(1) (1971). This term was construed by the Supreme Court of the United States in Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 301, 66 S. Ct. 1100, 1104, 90 L.Ed. 1244, 163 A.L.R. 1043 (1946) as follows:

> The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

This test was accepted for the same term in the Texas Securities Act in Koscot Interplanetary, Inc. v. King, 452 S.W.2d 531 (Tex.Civ.App.—Austin 1970, writ ref'd n. r.e.).

Defendants concede that the options in question involved investment of money with an expectation of profit, but deny that they involved a "common enterprise" or that the profits would result "solely from the efforts of others." They rely on authorities holding that commodities futures contracts are not "investment contracts,"[1] and argue that if commodity futures contracts are not "securities," then options to purchase them cannot be "securities." This argument ignores an important distinction. A speculator in commodity futures risks his own money, and his only source of profit is the commodity market itself. The evidence here shows that on purchase of a "commodity option," the customer's money is not placed at risk beyond a relatively small "premium" of between two and one-half and eight percent of the value of the commodity. The source of profit is not solely the commodity market, but also the trading operations of the option dealer, who must use funds other than those of the individual customer.

■ This conclusion is supported by the advertising literature which King distributed to its customers. We take this literature as defining the nature of the transaction because the alleged "securities" offered may be judged as being what they were represented to be. Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 353, 64 S.Ct. 120, 88 L.Ed. 88 (1943). Among this literature is a brochure characterizing "commodity options" as "an investment technique that combines aspects of conservatism, speculation and leverage," and explaining:

> The amount of capital at risk in purchasing an option is limited to the cost of premium paid for the option. The investor can never lose more than the amount of his premium. . . . The potential profit on a commodity option is unlimited—a return of several 100% in as short a period as 30 days is not impossible. . . . By purchasing an option, a given position can be retained in any market without margin calls of any kind, even if the price of the commodity should fluctuate widely.

The brochure goes on to describe a "double option program" as "an investment program designed to make use of the tremendous leverage and volatility of the Commodity Futures Market, while limiting the risk and with no margin calls or forced liquidation." A "call option" is defined in the brochure as "the right to buy a future contract at a guaranteed price on or before a specified date." A "put option" is defined as "the right to sell a future contract at a guaranteed price on or before a specified date."

1. Milnarik v. M-S Commodities, Inc., 457 F.2d 274 (7th Cir. 1972) ; McCurnin v. Kohlmeyer & Co., 340 F.Supp. 1338, 1341 (E.D.La.1972) ; Sinva, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 253 F.Supp. 359, 366 (S.D.N.Y.1966).

The brochure further explains:

A DOUBLE OPTION is a PUT and CALL purchased back to back for the same contract, or in other words a straddle. Because you will have both a PUT and CALL it does not matter whether the market moves up or down, just so it moves away from the striking price. (The price at which you buy in.) To avoid a loss, the market must move up or down enough to cover the cost of the premium. Further movement in the same direction produces a profit.

. . . . . .

When the price of the world commodity has moved enough to return a PRE-DETERMINED NET PROFIT, you exercise the DOUBLE OPTION (selling both the PUT and the CALL back to King Commodity Company) take your profit and reinvest in a New DOUBLE OPTION with a new striking price.

Also in evidence is a printed document entitled "Investor's Guaranty Corporation Commodity Option Operating Rules and Procedures." Defendants admit that "Investor's Guaranty Corporation" was only an assumed name for King Commodity Company of Texas, Inc. This document describes the market operations as follows:

Investors Guaranty Corporation, through its membership with the West Coast Commodity Exchange and other affiliated exchanges, takes a position on the open futures market for all options sold; by they puts, calls, or double options. These options are thus hedged with the movement of the futures market.

For example, if the market is on the downtrend, a short position is established; if the market is in an uptrend, a long position is established. This position may be changed from time to time as the movement of the market dictates, but all options remain fully hedged.

In the advertising material King is represented to be a "member West Coast Commodity Exchange" and "world commodity specialists." Its president, C. Lee Harshfield, who is one of the defendants here, is designated "chief administrator," and is represented to have "over 20 years experience in all phases of administration and management."

The conclusion that King used other money in its trading operations is supported also by testimony at the hearing. Don Thompson, who was formerly employed by King as a salesman, testified that he told his clients that their positions were being protected on the futures market by hedging on the West Coast Commodity Exchange. In other words, he said, if a person bought a "call option," the company would take a long position in the futures market and would hold that position until the option was exercised. Thompson further explained that in the case of a "call option," the hedger would buy a contract on the futures market and in the case of a "put" he would sell the contract. In case of a "double option," the hedger would wait until the market "penetrated" one way or the other and then would take a position. If the market continued to go up, the option dealer would be able to take enough money out of the futures market plus a portion of the premium to pay off the customer. If the market reversed the "striking price" several times, the dealer would have to lift the hedge several times, and eventually the option money would be eaten up, so that the dealer would be predicating his profit on the fact that the market would not move through the "striking price" more than a few times.

It is a reasonable inference from this evidence that the money necessary to hedge each option could only come from pooling of the premiums paid by other customers and that if King's use of this money in its trading operations was not profitable, no funds would be available to pay the customers their profits. Thus the trial court would have been justified in finding, and we presume that it did find, that the evidence establishes a "common enterprise" within the *Howey* test.

Defendants also deny that the profits would come "solely from the efforts of others" within the *Howey* test. As we have already explained, the profits were apparently generated by King's management of funds other than the premium advanced by the individual customer. Whether absolute nonparticipation of the investor is an essential element of an "investment contract" is doubtful in light of such decisions as Securities and Exchange Commission v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 482 (9th Cir. 1973) and State Commissioner of Securities v. Hawaii Market Center, Inc., 52 Haw. 642, 485 P.2d 105, 108 (1971). In the present case the customer's participation was minimal. Although he was privileged to follow the market fluctuations of the commodity in question and make his own decision about exercising his option, he was not required to do so. The advertising literature expressly represented that he did not have to "watch the market quotations." It said, "You are free to spend all your time at your business or hobby and leave the details to us." It also represented that the options would be exercised "when the price of the world commodity has moved enough to return a predetermined net profit." We take this to mean that the option would be exercised without further instructions from the customer whenever the market price reached the point at which the amount of profit previously determined could be realized.

Mark Kimmins, one of the former customers who appeared as a witness for the State, testified that he dealt with King through a broker who sent him the advertising material above described. His initial investment was $1400 for a "double option" on 10,000 ounces of silver. Without further directions from him his options were automatically exercised for a profit, and in the language of the trade, were "rolled" into new options every week or ten days. He merely kept in touch with the broker to see how his account was doing. He knew, however, that the final decision was his and that he could take his profit out at any time. He tried to plot the ups and downs of his commodity from quotations in the *Wall Street Journal*, but he could not pinpoint his profit because the price would fluctuate so greatly that he was always far behind.

Another customer, Doris Hicks Moore, who lived in Pecos, Texas, testified that she dealt with King through Don Thompson of their Dallas office entirely by telephone. On one occasion she called in and requested that her options be exercised, but that was not done. Thompson suggested to her later that she would make more money by leaving them a little longer, but she insisted that they be sold to recover her original investment of $13,200, leaving more than $10,000 profit on the books, which she was going to "roll over," as Thompson said, into new options and "make lots of money." Thompson corroborated this testimony and said that his original arrangement with Mrs. Moore was to exercise her options whenever the potential profit reached fifty percent, but that they later decided to take a smaller profit.

In short, the evidence shows that after the original transaction no effort or participation on the part of the customer was necessary in order to realize a profit, although the customer could elect to make his own decision as to the time of exercising his option. The *Howey* opinion itself holds that the choice of some investors not to accept the offer of complete management of the investment does not prevent the arrangement from having the ingredients of an "investment contract." 328 U.S. 293, 300, 66 S.Ct. 1100. We hold that the option buyer's minimal privilege of participation in the management of his investment does not exempt the transaction from registration as a "security" under the Act.

### (2) *Evidence of indebtedness*

"Evidence of indebtedness" is another term taken from § 2(1) of the Federal Securities Act of 1933, 15 U.S.C. § 77b(1)

(1971). As used in that Act, it has been interpreted to include "all contractual obligations to pay in the future for consideration presently received." United States v. Austin, 462 F.2d 724, 736 (10th Cir. 1972). The "option certificates" in this record, considered in the light of the representations in King's advertising literature, appear to be contractual obligations of King to pay money in the future. The brochure referred to above contains the following paragraph:

## GUARANTEE

All options sold by King Commodity of Texas, Inc. are guaranteed and governed under the rules and regulations of the State of Texas. Investor's Guaranty Corporation issues the OPTION Certificates, thus eliminating any doubt as to its guarantor. Only PUT and CALL OPTIONS with these Certificates are guaranteed by Investor's Guaranty Corporation. All earned equities remain intact in a segregated bank trust account and are adjusted on a daily basis during the entire life of the option for the sole use and benefit of the customer.

The brochure describes the exercise of a "double option" as "selling both the put and call back to King Commodity Company." The "operating rules and procedures" represent that options "may be liquidated or exercised at the buyer's option." They further explain:

As an additional customer safeguard, any fluctuation of the market for an option buyer which results in an equity from the striking price, that equity will be deposited on a daily basis in a segregated customer account. For example, if a customer bought a silver option and the striking price was $2.3000 and the price moved to $3.000 resulting in an option holders equity of $700.00, that $700.00 is deposited in the segregated account and any additional equity is deposited on a daily basis.

Thus it appears that although the customer may have had a theoretical right to take over an actual futures contract by paying the full price specified in his certificate, he was told that he had the right to demand cash for his option. According to the literature, King had no right to insist that the customer assume the obligation of a futures contract either to deliver or to accept delivery of the commodity specified. The testimony of the customers Kimmins and Moore and of the salesman Thompson shows that King's method of operation was to pay in cash the difference between the "striking price" and the "market price" or credit that amount to the customer's account and invest it in a new option. Defendants have never denied King's liability to the customers, and their counsel even assured Mrs. Moore in open court that efforts would be made to pay her claim.

In other words, King represented to the customer that whenever he chose to exercise his option, King or "Investor's Guaranty Corporation" would have his profit in the bank and would pay it to him in cash on demand. Regardless of the fact that the market price determined the amount to be paid and even whether any amount was due, the options were sold as "guaranteed" obligations of King to pay money on certain contingencies. Therefore, they were "evidences of indebtedness" subject to registration as "securities" within the Act.

## II. JURISDICTION OF RECEIVERSHIP

King Commodity Corporation of Texas, Inc. is a corporation subject to the Texas Business Corporations Act, with its registered office in Harris County. The State seeks to sustain appointment of the receiver by the district court of Dallas County under Tex.Rev.Civ.Stat.Ann. art. 2293 (Vernon 1971), which provides that receivers may be appointed "by any . . . court of competent jurisdiction" in various situations, including "cases

where a corporation is insolvent or is in imminent danger of insolvency." King contends that the court had no jurisdiction to make the appointment because of the restrictive provisions of Tex.Bus.Corp.Act Ann. arts. 7.05 and 7.07 (Vernon 1956), V.A.T.S. We agree with King's contention in this respect.

Article 7.05, so far as here material, provides:

A. A receiver may be appointed for the assets and business of a corporation by the district court for the county in which the registered office of the corporation is located . . . .

Article 7.07 provides:

A. No receiver shall be appointed for any corporation to which this Act applies or for any of its assets or for its business except as provided for and on the conditions set forth in this Act.

. . . . . .

E. A court authorized to appoint a receiver for a corporation to which this Act applies, *and no other court in this State,* shall be authorized to appoint a receiver for the corporation or its assets and business; when such a court does appoint a receiver, as authorized by this Act, for the corporation or its assets and business, that court shall have exclusive jurisdiction of the corporation and all its properties, wherever situated. [Emphasis added.]

The State contends that these provisions are not exclusive and do not preclude an action under other statutory provisions, such as article 2293. We cannot accept this construction. The language of article 7.07 above quoted could hardly be more explicit or more clearly mandatory. The scope left for the more general statutes governing receivers, including article 2293, is stated in the comment of the bar committee following Tex.Bus.Corp.Act Ann. art. 7.04 (Vernon 1956) as follows:

These general provisions will continue to be applicable to receiverships other than those for corporations subject to the Act or their assets, and will also continue to be applicable to receiverships for corporations or their assets with respect to such matters as qualifications, powers, duties, and administrative procedures of receivers which are not inconsistent with the specific provisions of the Act.

We conclude that with respect to corporations subject to the Act, articles 7.05 and 7.07 are not merely cumulative, but limit jurisdiction to appoint a receiver for the assets and business of the corporation to the district courts of the county in which the corporation has its registered office.

■ Neither can we accept the State's contention that even though venue was improper, the district court of Dallas County had jurisdiction to preserve the subject matter and maintain the status quo by appointment of a receiver pending determination of proper venue at a hearing for that purpose.[2] The clear intent of article 7.07 is to restrict appointments of receivers for all assets and business of the corporation to the district courts of the county where the corporation has its registered office, and not merely to permit the receivership proceeding to be transferred to that county on plea of privilege. *Cf.* Alpha Petroleum Co. v. Terrell, 122 Tex. 257, 59 S.W.2d 364 (1933); Johnson v. Sharpstown State Bank, 503 S.W.2d 667 (Tex.Civ.App.— Eastland 1973, rev'd on other grounds, 17 Tex.Sup.Ct.J. 252 (March 30, 1974)); Goff v. State Board of Insurance, 319 S. W.2d 383 (Tex.Civ.App.—Dallas 1958, no writ).

2. The statement in Rex. Refining Co., Inc. v. Morris, 72 S.W.2d 687, 690 (Tex.Civ.App.— Dallas 1934, no writ) which appears to support this argument, was not necessary to the decision of that case, since the appointment was held to be improper on other grounds, and was expressly contrary to the earlier decision of the Supreme Court in Shell Petroleum Corp. v. Grays, 122 Tex. 491, 62 S.W.2d 113, 120 (1933), in which appointment of a receiver by a court which did not have proper venue was reversed.

The order of the trial court granting the temporary injunction is affirmed; the order appointing the receiver is reversed and the receivership is dissolved.

### On appellants' motion for rehearing

■ Three of the individual appellants have moved for rehearing on the ground that there is no evidence that they ever sold or offered to sell any "commodity options." We are unable to find any language in their brief raising this contention. They assert that this ground is germane to the first point of error in appellants' brief, but that point states only that there was "no evidence before the court that the commodity option contracts sold and offered for sale by Appellants were 'unregistered securities' within the meaning of the Texas Securities Act." The argument under the point contains no suggestion that any of the appellants were not shown to have sold "commodity options" or to have offered them for sale. Consequently, their motion for rehearing is overruled.

### On appellee's motion for rehearing

The State's motion for rehearing complains of only that part of our opinion concerning the receivership. The Attorney General argues that we erred in applying Tex.Bus.Corp.Act Ann. arts. 7.05 and 7.07 and in holding that the district court of Dallas County had no jurisdiction under these statutes to appoint a receiver. The Attorney General interprets these statutes as limited to two varieties of receiverships: (1) those involved in the involuntary dissolution of corporations and (2) those limited to specific assets of corporations. He argues that our opinion limits jurisdiction to grant receivership to those situations and excludes receivership in other situations in which receivership has long been recognized as a proper remedy.

■ This argument misconstrues our opinion and the statutes as well. Articles 7.05 and 7.07 are not limited to cases in which receivership is sought for specific assets of a corporation or for dissolution of a corporation and liquidation of its assets. Those cases are expressly covered by articles 7.04 and 7.06. Article 7.05 applies "whenever circumstances exist deemed by the court to require the appointment of a receiver to conserve the assets and business of the corporation and to avoid damage to parties at interest." No reason is suggested why this language does not cover the receivership here.

■ Neither can we agree with the State's argument that an ancillary receiver for the assets and business of a corporation may properly be appointed by any district court which has venue of a suit against the corporation on some other ground. The Attorney General relies on cases which did not involve the provisions of our present Business Corporations Act. Article 7.05 expressly provides, "A receiver may be appointed for the assets and business of a corporation by the district court for the county in which the registered office of the corporation is located," and article 7.07 provides "no other court in this State, shall be authorized to appoint a receiver for the corporation or its assets and business." This unequivocal and mandatory language precludes the holding that a receivership of the entire business and assets of a corporation may be employed by a district court in any of the state's two hundred and fifty-four counties as a remedy ancillary to some other cause of action of which the court may have venue. For an interpretation of these statutes, see Leeds, Merger, Consolidation, Reorganization, and Receivership under the Texas Business Corporations Act, 3A Tex.Rev. Civ.Stat.Ann. 490, 497 (1956).

In one respect our original opinion may have been in error. We stated that articles 7.05 and 7.07 "limit jurisdiction to appoint a receiver for the assets and business of the corporation to the district courts of the county in which the corporation has its registered office." Upon further study we

conclude that "jurisdiction" is not the proper word. "Authority" is more accurate, since article 7.07(E) uses the word "authorized." Mr. Leeds, in the article above cited, uses the term "exclusive venue." The statute involves more than venue in the ordinary sense of the county in which the suit is to be tried on the merits. Regardless of terminology, the precise question is whether the unauthorized appointment of a receiver by a court in a county other than that in which the corporation has its registered office is a matter to be corrected only by the plea-of-privilege practice under Texas Rules of Civil Procedure, rules 86 and 87, or whether it may be corrected on appeal under Tex. Rev.Civ.Stat.Ann. art. 2250 (Vernon 1971), which allows an interlocutory appeal from an order appointing a receiver.

We conclude that transfer on plea of privilege is not the exclusive remedy. The plea-of-privilege practice is designed to assure a defendant his right to have the case tried on the merits in the county of proper venue, but is not effective to prevent improper appointment of a receiver at the preliminary stage. If a court of another county erroneously appoints a receiver, the error is not rectified by simply transferring the receivership to the proper county. The second court may not be acquainted with the receiver and may prefer to appoint a local resident that the court knows to be qualified. Such a case would require both a receivership hearing and a venue hearing in the first court and would also require a hearing in the second court to determine whether the original receiver should be discharged or replaced. After transfer, the defendant would in many cases move for dissolution of the receivership, and the second court would then be required to hear the same evidence and consider the same grounds

and defenses presented in the original receivership hearing. The remedy of an interlocutory appeal under article 2250 from the original order appointing the receiver is more expeditious and its existence would tend to discourage applications for receiverships in counties other than that in which the corporation has its registered office.

Receivership for all assets and business of a corporation is a drastic remedy and is subject to abuse. An unauthorized appointment may affect the affairs of the corporation seriously and adversely before the proceedings can be transferred on plea of privilege to the proper county and a further hearing held there. The clear legislative policy of limiting authority for such appointments to courts of the county of the registered office would be defeated to a substantial extent if the only remedy for an unauthorized appointment would be transfer on plea of privilege.

We need not pass on the effect of the appointment of a receiver by a court having no statutory authority to do so if the corporation consents to such appointment or appears and makes no objection, since that question is not before us. By withdrawing the term "jurisdiction" and substituting "authority," we avoid any decision of that question. On the record before us we hold that only a district court of the county in which the corporation has its registered office has authority to appoint a receiver for the assets and business of a corporation subject to the Texas Business Corporations Act and that such an appointment by a court of any other county may be set aside on an interlocutory appeal under article 2250.

Appellee's motion for rehearing is also overruled.