H. E. SEARSY et al., Petitioners,

v.

COMMERCIAL TRADING CORPORA-
TION et al., Respondents.

No. B–6775.

Supreme Court of Texas.

Dec. 30, 1977.

Rehearing Denied Feb. 8, 1978.

**638**

Dean Carlton, Dallas, for petitioner.

Sessions, Sessions, Neill, Scucchi & Hatch, W. R. Sessions, Dallas, Walker, Bishop & Larimore, Tom L. Larimore and James R. Lamsens, Fort Worth, for respondent.

DENTON, Justice.

The question to be decided in this case is whether certain commodity options sold by Commercial Trading Corporation to plaintiffs are "securities" within the meaning of the Texas Securities Act.[1] The trial court held that the commodity options in question are securities, and rendered judgment for plaintiffs for damages and rescission of the option sales. The court of civil appeals concluded that the commodity options are not "securities." Consequently, it reversed and rendered judgment that plaintiffs take nothing. 559 S.W.2d 663. We hold that the commodity options at issue are "securities" within the meaning of the statute, and accordingly reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

H. E. Searsy was one of eighty-four named plaintiffs who brought a class action suit against Commercial Trading Corporation (CTC) and Standard Trading Corporation (STC) for rescission and damages. The basis of the action was the sale by defendants of commodity options to plaintiffs, which were alleged to be unregistered securities. Under article 581–33 of the Texas Securities Act, the buyer of an unregistered security may sue to recover the consideration paid for the security plus interest thereon at six per cent per annum.[2]

CTC was engaged in the business of selling "puts," "calls," and "double options" on commodity futures contracts. A "put" was an option to *sell* an underlying commodity futures contract for a specified price, while a "call" was an option to *buy* a futures contract. A "double option" was an option to either buy or sell a futures contract at a certain price. The price specified in the option was known as the "striking price," which was usually the current market price of a futures contract on the date of the option. The period of the option was a fixed and relatively short term, usually six months. Consideration for the sale of an option was the "premium." Approximately eighty-five per cent of the sales were of double options.

Profit was made on a double option when the market price varied from the striking price by an amount in excess of the premium. If the market rose to a price in excess of the premium, the double option holder would exercise his call option, "buying" the futures contract and then "selling" the contract at the higher market price. The put option was not exercised. Likewise, the investor in a falling market would exercise his put and abandon his call option.

---

1. Reference is made to the Texas Securities Act, Tex.Rev.Civ.Stat.Ann. art. 581–1 *et seq.* (Vernon 1964).

2. It should be noted at the outset that regulation of commodity options is now controlled by the Commodity Futures Trading Commission Act of 1974, 7 U.S.C. § 4a (Supp.1977), effective April 21, 1975. The Act preempts the field and gives the CFTC exclusive regulatory jurisdiction over the sale of commodity options. Although private rights of investors under state securities laws may still exist, *see* Bromberg, *infra* at 298, the facts in this case arose before the effective date of the federal Act. Our analysis will be limited to the applicability of the Texas Securities Act.

Although customers of CTC may have believed that they owned options on futures contracts, in reality no actual purchases or sales of futures contracts ever took place between CTC and the investors. Upon the exercise of an option, the customer was credited with an amount equal to his profit. This money was often "rolled over" into the purchase of new commodity option contracts. Thus, no actual futures contract was ever delivered to either party, although the net cash result was the same as if there had been an actual purchase and sale. Commodity options such as these which are not a bona fide option in an actual futures contract are generally known as "naked" options. *See* Long, *The Naked Commodity Option Contract As A Security*, 15 Wm. & Mary L.Rev. 211 (1973).

The seller of options makes his profit (and pays the investors) from the "hedging" of option premiums. It was the duty of STC as CTC's affiliate to underwrite the options and conduct the hedging program for CTC. Basically, this involves covering the seller's market position by owning or holding sufficient assets to buy futures contracts, the actual commodities, or actual put or call options in futures contracts. Bromberg, *Commodities Law and Securities Law,* 1 J.Corp.L. 217, 258–60 (1975). STC's hedging program was conducted pursuant to an objective computer analysis combined with the subjective analysis of STC personnel. Thus, the ability of CTC to perform its contractual obligation to the investor was solely dependent on the skill and ability with which STC invested the money and hedged the contracts of the numerous investors whose funds CTC had received. *King Commodity Co. of Texas v. State*, 508 S.W.2d 439 (Tex.Civ.App.—Dallas 1974, no writ).

CTC also gave extensive investment counseling with regard to the purchase and exercise of its commodity options. The customers were generally unsophisticated in commodities market matters, and indeed, CTC pointed out to potential customers that they need not know anything about the commodities market. Rather, CTC personnel would guide them in the proper invest-

ment decisions to make. CTC literature also pointed out that the double option provided a high profit potential without having to fight the market by trying to guess whether it would go up or down. Only market volatility was required for the investor to make a profit.

CTC and STC were placed in receivership in November, 1973. Plaintiffs brought suit against CTC, STC, the individual stockholders, and the receiver for rescission and damages resulting from defendants' sale of unregistered securities. They also sought damages for common law fraud and other statutory violations. After a jury trial, judgment was rendered for plaintiffs for $187,758.80. The court of civil appeals reversed and rendered judgment that plaintiffs take nothing. The issue squarely before this Court is whether the commodity options sold by CTC fall within the definition of "security." If so, plaintiffs are entitled to rescission and return of all consideration paid since the commodity options were not registered as securities.

Securities are defined in the Texas Securities Act, art. 581–4(A) as follows:

> The term "security" or "securities" shall include any share, stock . . . note, bond, debenture, mortgage certificate or other *evidence of indebtedness* . . . or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, *investment contract* or any other instrument commonly known as a security, whether similar to those herein referred to or not. [Emphasis added.]

The terms "investment contract" and "evidence of indebtedness" appear to have been taken from an almost identical definition of "security" in the Federal Securities Act of 1933, 15 U.S.C. § 77b(1) (1971).

### Investment Contract

The term "investment contract" was construed by the United States Supreme Court in *S. E. C. v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244, 1251 (1946) as follows:

The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

The definition has been widely accepted in state and federal cases. Texas courts have also accepted and used it. *Clayton Brokerage Co. of St. Louis v. Mouer,* 520 S.W.2d 802 (Tex.Civ.App.—Austin, writ ref'd n. r. e.), *dism'd as moot on rehearing per curiam,* 531 S.W.2d 805 (Tex.1975); *King Commodity Co. of Texas v. State,* 508 S.W.2d 439 (Tex.Civ.App.—Dallas 1974, no writ).

The *Howey* test embodies four requirements: (1) investment of money; (2) a common enterprise; (3) expectation of profits; (4) solely from the efforts of others. The *Howey* case involved a promoter who sold small plots of land which were to be used as citrus groves. Along with the land sale contract, the Howey-in-the-Hills Service Company offered a service contract for the development and cultivation of the land as well as the marketing of fruit raised thereon. Almost all of the investors purchased the service contract with the plots of land. The Supreme Court held that under the above quoted definition the contracts were "investment contracts" and therefore securities. The *Howey* test has been applied in many cases to hold various forms of money-making schemes to constitute investment contracts.

There is little dispute as to the first and third elements of the *Howey* test in this case. The purchase of commodity options was obviously an "investment of money" with the "expectation of profits." The controversy is whether the sale of commodity options by CTC to investors constituted a "common enterprise," with investors' profits to come "solely from the efforts of others."

■ CTC argues that the common enterprise or "commonality" element is lacking because the profits of each customer depended on the fluctuations of the commodity market and the customer's own investment decisions. Furthermore, they contend that there was no direct relationship between options sold to different customers.

We agree that there was no horizontal commonality in this case. Horizontal commonality is between investors and means that the success of one investor is concomitant with the success of other investors. Obviously, different customers of CTC had varying investment results because different commodity options were bought and exercised at different times. The more recent weight of authority, however, permits a showing of *vertical* commonality—common enterprise between investor and promoter, so that the success of the investor is dependent upon the efforts and success of the promoter. *S. E. C. v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974); *S. E. C. v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). Here, the ability of CTC to perform its contractual obligation was solely dependent on the success of the hedging program conducted by STC. Approximately seventy per cent of customers' premiums went to STC to invest and cover the market position of CTC. The fact that each investor's activity is unitary and unrelated to other investors does not destroy the common enterprise requirement. The situation was quite similar in *King Commodity Co. of Texas v. State,* 508 S.W.2d 439, 443 (Tex.Civ.App.—Dallas 1974, no writ), in which the court stated:

> [T]he money necessary to hedge each option could only come from pooling of the premiums paid by other customers and that if King's use of this money in its trading operations was not profitable, no funds would be available to pay the customers their profits. Thus . . . the evidence establishes a "common enterprise" within the *Howey* test.

We find that the requisite "common enterprise" existed in this case.

The final element of the *Howey* test which is in dispute is whether the profits anticipated by investors would result solely from the efforts of others. The court of civil appeals found that this requirement of an investment contract was not satisfied, and reversed on that basis. It is this finding with which we disagree.

■ Early cases construing the *Howey* test gave literal effect to the phrase "solely from the efforts of others." The investor was required to have exerted no effort with regard to the investment. The more recent trend, however, and in our view the more reasonable approach, is to use a more realistic test which inquires whether the investor made any *significant* efforts. The "solely from the efforts of others" requirement could be easily evaded by requiring the investor to exert some modicum of effort, such as picking one orange in the *Howey* citrus groves. This would be a blind and mechanical view of what constitutes an investment contract. We agree that the more realistic test is "whether the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *S. E. C. v. Glenn W. Turner Enterprises, Inc., supra* at 482; *King Commodity Co. of Texas v. State, supra; State Commissioner of Securities v. Hawaii Market Center, Inc.,* 52 Haw. 642, 485 P.2d 105 (1971).

In this case, CTC actively sought investors inexperienced in the commodities market. The salesmen provided these unsophisticated investors with market reports and buy and sell recommendations, but the investor decided on his own whether to exercise his option. It is the defendants' contention that the exercise of the option is the "effort" of investors sufficient to prevent the options from being securities.

■ We believe that the speculative nature of the investment necessarily contemplated that the investor would be heavily dependent upon CTC personnel and the advice which they gave. CTC personnel frankly testified that customers were not supposed to understand the CTC business operation. CTC salesmen used a WATS line to call customers when the market moved to a point of being profitable, and advised the customer what to do. Although the final decision was left to the customer, he rarely had any choice but to follow the advice given him by CTC. Upon a very similar set of facts, the Austin Court of Civil Appeals stated our view of this case:

Once a customer has parted with his money, he is dependent upon the financial responsibility, business ability, integrity, expertise and market advice of appellant and, unknown to him, third parties who participate in appellant's commodity trading. It is the essential managerial efforts of those other than the investor which affect the failure or success of the enterprise. Investors are not required to, and they do not, exert any significant efforts in order to make a profit on their investment. For all practical purposes the critical managerial decisions affecting the investor's funds are solely within the control of appellant. And finally, an investor cannot without the actual assistance of appellant, exercise his option and receive his profit.

*Clayton Brokerage Co. of St. Louis v. Mouer,* 520 S.W.2d 802, 809 (Tex.Civ.App.— Austin, writ ref'd n. r. e.), *dism'd as moot on rehearing per curiam,* 531 S.W.2d 805 (Tex.1975). We recognize that discretionary accounts were involved in *Clayton Brokerage,* by which the seller had de facto control of the customer's account with authority to buy or sell. We do not, however, view that as a distinguishing factor from this case since CTC was relied upon so heavily by its customers. Although the customers in this case as well as in *Clayton Brokerage* had the legal right to participate in the commodity options trading, the substance of the transaction was that the seller would exert the significant investment efforts. The investor was not required to actively participate and seldom did.

■ We conclude, therefore, that the commodity options sold by CTC in this case meet the requirements of an "investment contract," as set forth in the *Howey* test.

### Evidence of Indebtedness

"Evidence of indebtedness" is another term taken from the Federal Securities Act of 1933, 15 U.S.C. § 77b(1) (1971). It has been defined to mean "all contractual obligations to pay in the future for consideration presently received." *United States v.*

*Austin,* 462 F.2d 724, 736 (10th Cir.), *cert. denied,* 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972). The court of civil appeals found in this case that there was no "evidence of indebtedness," but only contracts in which CTC agreed to obtain commodity futures for the customer if he exercised his options. We disagree with this finding.

As pointed out above, the commodity options sold in this case were "naked" options. There was never a purchase or sale by defendants of any futures contract on behalf of a customer; only the net cash result of a hypothecated purchase or sale took place. A naked commodity option sold by CTC represented a *contingent* obligation on the part of CTC to pay the difference between the striking price of the option and the market price of the futures contract at the time the option was exercised.

The *Austin* case involved promoters who sold letters of commitment to construction companies in need of funds. The letters of commitment were promises to secure funds from third parties or, if a third party lender could not be found, the promoters promised to advance the money themselves. The court held that the letters of commitment were evidence of indebtedness as a matter of law, and therefore, securities. It stated:

> It is true that the letter of commitment is not an indicium of debt in the same sense as is a promissory note, but as used in the Securities Act no such restriction is appropriate. In last analysis, this letter of commitment was sold for a substantial consideration, and the buyer received what appeared to be an enforceable obligation which contemplated the flow of funds. It indicated a binding and legally enforceable right. Therefore, we can find no fault with the ruling of the trial court insofar as it regarded the letter of commitment as plainly being a security.

*United States v. Austin,* 462 F.2d 724, 736 (10th Cir.), *cert. denied,* 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972).

CTC represented in its literature that upon exercise of an option, the customers were assured of payment by "sufficient margin on deposit with Kohlmeyer and Company to initially hedge over $1,000,000 in silver." According to the testimony of the former president of CTC, STC was to underwrite and "guarantee" the options to the customers. Although the market fluctuations determined the amount to be paid or whether an amount was due, the options were represented as an obligation of CTC to pay money on certain contingencies. The automatic repurchase feature converted CTC's obligation from one to buy or sell futures contracts to one to pay a monetary return at some future time. We hold that this brings the commodity options within the definition of an "evidence of indebtedness." *King Commodity Co. of Texas v. State,* 508 S.W.2d 439, 445 (Tex.Civ.App.— Dallas 1974, no writ); Long, *The Naked Commodity Option Contract As A Security,* 15 Wm. & Mary L.Rev. 211, 240–41 (1973).

In conclusion, we hold that the commodity options sold by CTC in this case were both investment contracts and evidence of indebtedness. It therefore follows that defendants have sold unregistered securities, for which plaintiffs are entitled to rescission and a return of their consideration paid. The judgment of the court of civil appeals is reversed and that of the trial court affirmed.

CHADICK, J., not sitting.