**Bette J. MAYFIELD et al., Appellants,**

v.

**Forrest TROUTMAN et al., Appellees.**

**No. 1421.**

Court of Civil Appeals of Texas, Tyler.

Feb. 26, 1981.

Rehearing Denied March 26, 1981.

Louis Frank Oliver, McGinnis, Lochridge & Kilgore, Richard Banks, J. Rowland Cook, Salmanson, Smith & Mouer, Austin, for appellants.

Malcolm Robinson, Hooper, Robinson & Moeller, Austin, for appellees.

McKAY, Justice.

This is an appeal from a directed verdict rendered in an action for fraud under the Texas Securities Act.

Appellants Mayfield, Schilthuis, Brooks and Friedman were four of our nine limited partners in a Texas limited partnership named "335, Ltd." (335). Pursuant to the antifraud provisions of the Texas Securities Act (Tex.Rev.Civ.Stat.Ann., art. 581–1 et seq.) (Securities Act), they seek damages or rescission in connection with the purchase of their limited partnership investments. The principal questions involved in this case are: (1) whether the interests in the limited partnership purchased by each of the appellants was a "security," thereby subjecting the sale to the Act and (2) whether appellants ratified the allegedly fraudulent acts of appellees. Appellant Mayfield filed her brief separately from the other appellants. An amicus curiae brief was filed by the state attorney general's office on behalf of Richard D. Latham, the Securities Commissioner of Texas.

On April 2, 1974, three months before the limited partnership was formed, appellant Forrest Troutman contracted with Mrs. Nellie Marie Boothe Hampe-Moerhing for the purchase of a 335-acre parcel of undeveloped land west of Austin. The contract called for a cash payment at settlement of $52,500 and an installment note to be executed by Forrest Troutman for $583,614.70. The contract also specified that Mrs. Hampe would pay Morris Olguin, who was later the general partner of 335, Ltd., a broker's commission of $24,000, in three equal installments, the first being at the July 1974 closing, and the next two upon the July 1975 and 1976 interest payments to Mrs. Hampe.

After the April 2, 1974, contract was made, potential limited partners, including appellants, were solicited concerning their possible investment in the partnership, the purpose of which was to purchase the same 335-acre parcel of land and hold it for a time while the general partner sought and arranged for a profitable sale.

On July 2, 1974, the partnership was formed and the land in question was the subject of two closings, both of which occurred in the offices of Austin Title Company under the direction of its executive vice president, appellant Wayne Talley. The first transfer was from Mrs. Hampe to Troutman, and the second from Troutman to 335, Ltd.

Disregarding the settlement fees and expenses, the terms of the two transactions are as follows:

|  | Cash | Note |
|---|---|---|
| Hampe to Troutman | 62,500.00 | $583,614.70 |
| Troutman to 335, Ltd. | $119,145.30 | " |

Appellants alleged fraud stemming from the second sale because of the failure of appellees to tell the limited partners:

1. That Olguin, Troutman and Talley had an undisclosed agreement among themselves to split all profits realized on the land transaction;

2. That the two-step conveyance at a marked-up price resulted in Olguin, Troutman and Talley realizing an immediate cash

gain of approximately $42,500, exclusive of fees and closing costs ($105,000 cash raised from the limited partners, less $62,500 cash paid to Mrs. Hampe on closing). By Troutman's own testimony, the net amount was quickly divided and paid in equal shares to Olguin, Troutman and Talley;

3. That the general partner, Olguin, reserved a $15,000 partnership interest in his own name (but actually for the benefit of Olguin, Troutman and Talley) without leaving any cash contribution with the limited partnership and without disclosing to the limited partners that the promoters had no capital at risk;

4. That the involvement of Talley and Troutman was not limited to performing services normally provided by a title company and an attorney, but instead involved extensive other relationships fraught with actual and potential conflicts of interest.

Mrs. Mayfield further alleges that Talley told her before her contribution that a sale of the property to an unnamed company was imminent, but by the summer of 1975, when the annual interest was due on the note, the property still had not been resold.

Additionally, Olguin, the general partner, was unable to continue his duties in 1976 because of personal and financial problems which apparently existed at the time the partnership was formed. As of July, 1974 Olguin was separated from his wife and knew a divorce was inevitable. Also prior to the closing, he knew that the IRS had begun an investigation of his financial conditions and tax returns which ultimately led to an IRS tax lien filed on his property. These difficulties were apparently known to Troutman and Talley at the time appellants were solicited for contributions to the limited partnership, but were not revealed to appellants.

Soon after the limited partnership was formed, the real estate market dropped substantially, and a quick sale became impossible. In view of Olguin's failures, Schilthuis, Brooks and Troutman generally undertook to collect the interest and tax payments from the limited partners for 1976, 1977 and 1978, and disburse the necessary payments.

After 1975 appellant Mayfield made no further interest payments.

In 1977, an effort was made to form a new 335, Ltd. The purpose was to try to bring about some organization to assure the land would not be lost through foreclosure, to attempt to clarify who was responsible for advertising the sale of the land and to name a new general partner in order that the new entity could convey title to the real estate, should a buyer appear. A new limited partnership agreement (new 335, Ltd.) was signed in mid-1977 by appellants Mayfield, Schilthuis and Brooks (and others) and by appellees Troutman & Talley, who were assuming Olguin's interest. Appellant Friedman did not enter into this second partnership agreement. Appellants claim that for a number of reasons the formation of a new partnership was not meant to ratify the past fraudulent actions of appellees. The new 335, Ltd., agreement was never filed with the Secretary of State as required under the Texas Limited Partnership Act.

The 1979 annual interest payment was not made to Mrs. Hampe by any of the limited partners, and the property was foreclosed.

Appellants' first point of error addresses the trial court's directed verdict for appellees in which the court determined that the limited partnership interests did not involve a "security" and therefore were not within the purview of the Texas Securities Act. The Securities Act at Art. 581, § 4 defines terms relevant to this case as follows:

A. The term "security" or "securities" shall include ... evidence of indebtedness ... any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, *investment contract,* or any other instrument commonly known as a security, whether similar to those herein referred to or not.

B. The terms "person" and "company" shall include a corporation, person,

joint stock company, partnership, *limited partnership* .... (Emphasis added.)

In order for the transaction before us to be subject to the Securities Act, it is therefore necessary for appellants' limited partnership interests to conform to at least one of the enumerated categories included in the definition of "security." After examining the record as to the nature of the limited partnership here involved, we find that the interest held by each appellant qualifies as an investment contract.

The landmark decision of *S.E.C. v. Howey*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946) specifies the criterion for an investment contract: "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." There is no dispute that the limited partners of 335 invested their money in a common enterprise to make a profit upon resale of the property. The sole ground of contention is whether the operation was dependent only on the efforts of someone other than the limited partners, i. e., Mr. Olguin, the general partner.

Some confusion arose as to what was meant by the requirement that profits "come solely from the efforts of others," and in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Supreme Court elaborated on the *Howey* test:

"The touchstone [of the test] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the *entrepreneurial or managerial efforts of others.*" (Emphasis added.)

The Texas Supreme Court adopted the *Howey* test and added yet another dimension to the definition of an investment contract in *Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637, 641 (Tex.1977):

We agree that the more realistic test is "whether the efforts made by those other than the investor are undeniably significant ones, those *essential managerial efforts which affect the failure or success of the enterprise.*" *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, supra at 482 [474 F.2d 476 (9th Cir.)]; *King Commodity Co. of Texas v. State*, supra [508 S.W.2d 439 (Tex.Civ.App.)]; *State Commissioner of Securities v. Hawaii Market Center, Inc.*, 52 Haw. 642, 485 P.2d 105 (1971). (Emphasis added.)

The question now before us is whether 335, Ltd., was operated in such a manner as to satisfy the requirements of *Howey* and its progenies. The testimony of each limited partner was that the main purpose of their investment was to hold the property for sale at an appreciated value. Likewise, appellants admitted in their pleadings that the goal of 335 was to keep the land for a short time and sell it for a profit. The limited partnership agreement itself, however, contains a more expansive list of purposes, including the improvement and leasing of the property.[1]

Appellees contend that the success of the limited partnership was not contingent on the efforts of the general partner, but rather depended exclusively on any inflation which might have occurred in the real es-

---

1. Article 111, section 31 of the agreement reads:

The purposes of the Partnership shall be: (a) to acquire approximately 335.2 acres of real property lying and situated in Travis County, Texas. The Limited Partners acknowledge that the Olguin Land Company will be paid a real estate commission in connection with the transfer of the property to 335, LTD.
(b) to own, hold, improve, manage and lease such property (real personal or mixed) and furnish services and goods to the tenants or other occupants thereof;

(c) to sell, exchange, or otherwise dispose of all or any of such property (real, personal or mixed) when the General Partner determines that such disposition is in the interest of the Partnership; and
(d) in general, to make any investments or expenditures and to take any and all action which is incidental or reasonably related to any of the specific purposes recited above or the powers recited in Section 3.2 hereinbelow.

tate market by the time of resale. The principal authority upon which appellees rely is *McConathy v. Dal Mac*, 545 S.W.2d 871, 875 (Tex.Civ.App.—Texarkana 1976, no writ) in which the court stated that the " 'Efforts' of a promoter or others . . . does not include the mere holding of property in anticipation of appreciation in value." See also *Wilson v. Lee*, 601 S.W.2d 483 (Tex.Civ. App.—Dallas 1980, no writ). Both the *McConathy* and *Wilson* cases involved *joint venture* interests in real property which was in each case to be held for appreciation and resold. No improvements were to be developed on either piece of property before resale. In *McConathy*, a venture manager was named to manage the property and given power to execute any necessary documents; however, the manager could not sell, mortgage or transfer the property or incur any debt in an amount greater than $2,000 unless expressly authorized by vote of 70% of the participants. Likewise in *Wilson*, certain actions could be taken by the managing company only with the unanimous consent of all owners, and combined owners of a 60% interest had the right to direct the operations of the joint venture. Also, the nominee title holder of the property could be changed at any time by vote of the holders of a 60% interest.

Both cases turn on the fact that no projects were to be undertaken by the manager (or anyone else) on the property and that any enhancement in value would be attributable to higher neighborhood land values at the time of resale. The duties of the manager were to be those necessary to "protect, preserve and maintain" the property, but because no profits were to be generated directly by the skill and efforts of the manager, a necessary requirement of the *Howey* test had not been met; therefore, the joint venture interests were not "securities."

In comparing the case before us to those discussed immediately above, it is critical to note one of the inherent differences be-

tween joint ventures and limited partnerships. One of the elements of a joint venture is "a mutual right of control or management of the enterprise." *Raybourn v. Lewis*, 567 S.W.2d 908, 911 (Tex.Civ.App.— San Antonio 1978, writ ref'd n.r.e.). A limited partner, however, is by statute prevented from exercising control over the business of the limited partnership, at least if he wishes to maintain his limited liability status. Tex.Rev.Civ.Stat.Ann. art. 6132a, § 8 (Vernon 1970).[2]

Under Texas' limited partnership law, therefore, appellants had no choice but to refrain from participating in the business operations of 335. These duties were conferred upon the general partner, Morris Olguin, by the limited partnership agreement. Olguin was given power to acquire and dispose of the property; manage, lease and improve the property; finance the activities of the partnership; hire personnel; execute documents; and perform various other duties necessary to run the partnership.

■ Appellants maintain that Olguin did nothing but collect money from the partners, pay the interest on the note and preserve the land for appreciation. The record shows that Olguin did perform more extensive duties with respect to the property, however. The general partner testified that he actively sought buyers for the property and "showed it several times to many brokers and people." He investigated the value of surrounding property in order to determine a price for the partnership property. The evidence shows that Olguin did attempt to sell gravel off the land to a company in Houston and even made a trip to that city to negotiate a possible sale. Olguin had a payment schedule prepared for the partners, in addition to making cash calls and collecting taxes from them. We find that Olguin did indeed act in a "managerial" capacity and was solely responsible for making the significant decisions affecting the success of 335. See *Searsy, supra.*

2. This section was amended in 1979 to add a creditor reliance test and a list of permissible acts which limited partners may perform.

It would be unrealistic to believe that any business operation could survive and profit without the expenditure of human effort. Even though the condition of the Austin real estate market was obviously a major factor in the success of 335, the skill and efforts of Morris Olguin were to be critical in actually consummating a profitable sale. Testimony showed the appellants relied on Olguin's rather extensive experience in the real estate business.[3]

Because Olguin was solely responsible for managing the partnership, we hold that the *Howey* and *Searsy* tests have been met and that appellants' interests in the limited partnership are investment contracts and are therefore "securities". Consequently, the sale of these interests to appellants is subject to the provisions of the Securities Act, and the trial court erred in directing a verdict to the contrary.

We note that limited partnership interests have been held to be "securities" under the federal securities act. *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 899 (5th Cir. 1977), appeal after remand 576 F.2d 91; *Goodman v. Epstein*, 582 F.2d 388, 406–407 (7th Cir. 1978); *McGreghar Land Co. v. Meguiar*, 521 F.2d 822, 824 (9th Cir. 1975); *Hirsch v. DuPont*, 396 F.Supp. 1214, 1227 (S.D.N.Y.1975); *New York Stock Exchange v. Sloan*, 394 F.Supp. 1303, 1311–1312 (S.D.N.Y.1975). The court in *Wilson v. Lee, supra*, states at p. 485:

> ... decisions of the federal system offer a reliable guide because the Security Act of 1933, 15 U.S.C.A. § 77a, et seq. (1971), includes a definition of "security" in virtually the same wording.

■ The second point of error raised by appellants contends that the trial court erred in directing a verdict for appellees on the issue of common law ratification, in that the statutory cause of action on which the case was tried provided for no such defense. We agree that ratification may not be raised as a defense to an action for fraud under the Securities Act; also, no alternative cause of action was brought for common law fraud, so no issue on ratification may be considered.

■ The Texas Securities Act makes it a violation to engage in "any fraud or fraudulent practice in the sale, offering for sale or delivery of ... any security...."' Tex. Rev.Civ.Stat.Ann. art. 581, § 29 C. Prior to its amendment in 1977, the only statutory defense available to the seller of securities in an action for fraud was if the buyer failed to prove he did not know and could not reasonably have known of the untruth or omission. Tex.Rev.Civ.Stat.Ann. art. 581, § 33 A(2).[4] If, upon remand, it is found that appellees were guilty of fraud under § 29 C of the Securities Act, ratification may not be raised to justify the making of an illegal contract. A contract which is made in violation of a statute is illegal and void and therefore not subject to ratification. *Peniche v. AeroMexico*, 580 S.W.2d 152, 157 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ); *Continental Fire & Casualty Ins. Corp. v. American Mfg. Co.*, 221 S.W.2d 1006, 1009 (Tex.Civ.App.—Fort Worth 1949, writ ref'd); *Roberts v. San Jacinto Shipbuilders, Inc.*, 198 S.W.2d 488, 492 (Tex.Civ. App.—Galveston 1946, writ ref'd n.r.e.); see 13 Tex.Jur.2d Contracts, § 220.

It follows from these conclusions that this judgment should be reversed and the cause remanded to the trial court to determine whether a violation of the Texas Securities Act occurred in the sale of appellants' limited partnership interest.

Judgment reversed and cause remanded.

---

**3.** Olguin had been active in real estate ventures since 1968. He received a broker's license in 1974, and prior to his involvement with 335 had been a general partner in at least two limited partnerships and a partner in at least three partnerships formed for the sale of real estate.

**4.** The 1977 amendment allows violators to escape liability by making a timely rescission offer.