# IN THE SUPREME COURT OF TEXAS

No. 14-0122

LIFE PARTNERS, INC. AND MILKIE/FERGUSON INVESTMENT, INC., PETITIONERS,

v.

MICHAEL ARNOLD, JANET ARNOLD, STEVE SOUTH AS TRUSTEE AND ON BEHALF OF THE SOUTH LIVING TRUST, JOHN S. FERRIS, M.D., CHRISTINE DUNCAN, AND ALL OTHERS SIMILARLY SITUATED, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

*~ consolidated for oral argument with ~*

No. 14-0226

LIFE PARTNERS HOLDINGS, INC., LIFE PARTNERS, INC., BRIAN. D. PARDO, R. SCOTT PEDEN, ADVANCE TRUST & LIFE ESCROW SERVICES, L.T.A., AND PURCHASE ESCROW SERVICES, LLC, PETITIONERS,

v.

STATE OF TEXAS, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued January 15, 2015**

JUSTICE BOYD delivered the opinion of the Court.

The primary issue in these two separate cases is whether a "life settlement agreement" or "viatical settlement agreement" is an "investment contract" and thus a "security" under the Texas

Securities Act. We hold that the agreements at issue are investment contracts because they constitute transactions through which a person pays money to participate in a common enterprise with the expectation of receiving profits, under circumstances in which the failure or success of the enterprise and the person's realization of the expected profits is at least predominately due to the entrepreneurial or managerial efforts of others. We decline to give today's holding only prospective application, and we decline to consider the merits of the "relief defendants'" evidentiary arguments. In short, we affirm the courts of appeals' judgments in both cases.

## I.
## Background

In *Life Partners, Inc. v. Arnold*, Michael and Janet Arnold and others[1] (collectively, the Arnolds) filed a class action lawsuit in Dallas County, seeking rescission and damages based on claims that Life Partners, Inc. and others[2] (collectively, Life Partners) violated the Texas Securities Act by selling unregistered securities and materially misrepresenting to purchasers that they were not, in fact, securities. 416 S.W.3d 577. Meanwhile, in *Life Partners, Inc. v. State*, the State of Texas filed a separate suit in Travis County, seeking an injunction and other relief based on allegations that Life Partners and others[3] had committed fraud in connection with the sale of securities.[4] ____S.W.3d____. Before a class was certified in *Arnold*, both district courts entered judgments in favor of Life Partners, holding that Life Partners had not promoted or marketed any

---

[1] The "others" include Steve South as Trustee and on behalf of South Living Trust, John S. Ferris, M.D., and Christine Duncan.

[2] The "others" include Milkie/Ferguson Investment, Inc.

[3] The "others" include Life Partners Holdings, Inc., Brian D. Pardo, R. Scott Peden, Advance Trust & Life Escrow Services, L.T.A., and Purchase Escrow Services, LLC.

[4] The State had previously sued Life Partners for violations of the Texas Deceptive Trade Practices Act in a case based on different underlying facts and presenting different legal issues than those presented here. *See State v. Life Partners, Inc.*, 243 S.W.3d 236, 244 (Tex. App.—Waco 2007, pet. denied) (reversing summary judgment in Life Partners' favor and remanding for further proceedings).

2

"securities" and thus could not be liable under the Texas Securities Act. The Dallas Court of Appeals reversed in part, affirmed in part, and remanded, holding that the life settlement agreements are securities under the Texas Securities Act. 416 S.W.3d at 592. The Austin Court of Appeals soon followed suit, "agree[ing] with the conclusions reached by the Dallas Court and fully incorporat[ing] its analysis." ___ S.W.3d at ___. Life Partners filed a petition for review in both cases, which we granted and consolidated for purposes of oral argument.

Since 1991, Life Partners has been engaged in the business of buying existing life insurance policies from those whose lives the policies insure, and then selling interests in those policies to others. These types of transactions are generally referred to as "life settlements" when the insured is elderly or "viatical settlements" when the insured is terminally ill. We will refer to both types collectively as "life settlement agreements." According to Life Partners, many people with life insurance desire to sell their policies so that they or their family members can enjoy the proceeds while the insured is still living. Life Partners purchases the policy from the insured for a "cash settlement" that is less than the amount the policy will pay at the time of the insured's death. To fund these purchases and its own business operations, Life Partners sells interests in the policies' future benefits to "investors" or "purchasers."[5] The process thus involves at least two distinct business transactions, the first being Life Partners' purchase of the policy from an insured and the second being Life Partners' sale of interests in the policy to its purchasers. The issue here is whether the second transaction constitutes the sale of a "security" under the Texas Securities Act.

Life Partners advertises life settlement agreements as a "sure" investment. Its sales pamphlet asserts: "There's no need to worry about which way the wind is blowing. The returns on

---

[5] Although even Life Partners refers to those who buy interests in its insurance policies as "investors," we will use the term "purchasers" to avoid confusion, since the issue here is whether their agreement to buy the interests is an "investment contract."

3

life settlements, unlike stocks, mutual funds and other investments, are unaffected by market fluctuations, business cycles, the economy or global unrest." Life Partners assures purchasers that, "[n]ot only are your investments safe from these market risks, they have the opportunity to provide exceptional return on investment." If investments in a life settlement are indeed "safe from these market risks," however, they are not free from all risks. In particular, because Life Partners calculates a policy's value based on the insured's life expectancy and must pay the policy's premiums until the insured's death to collect on the policy, the anticipated returns are diminished, and sometimes lost, when the insured lives longer than Life Partners projects.

When selecting policies to purchase, Life Partners identifies insureds who are interested in selling their policies, evaluates their medical condition, predicts their life expectancy, and evaluates the policies' terms and conditions to ensure they are assignable. It then determines how much to pay for the policy based on the insured's life expectancy, the amount of the benefit, and related factors. Life Partners acknowledges that those who purchase an interest in the policies "depend upon [Life Partners'] ability to predict life expectancies and set the appropriate prices." If Life Partners accurately predicts the insured's life expectancy and negotiates a favorable purchase price, those who purchase an interest in the policy will receive a profit when the policy is paid. But if Life Partners' prediction is inaccurate or its negotiations ineffective, the purchasers can end up having to pay more to cover premiums than they will receive when the policy benefit is paid.

Life Partners uses the purchasers' funds to (1) pay the insured for the policy, (2) create an escrow account from which to pay the policy's future premiums as they come due, (3) pay fees to escrow agents and to any brokers who helped sell the interests to the purchasers, and (4) pay Life Partners an administration or brokerage fee. Life Partners does not disclose to the purchasers how

4

much of their investment goes to each of these purposes, but instead gives them only a total "acquisition price." Until the purchasers pay that price, they receive no information about the insureds or their policies. Once they have paid the acquisition price, the purchasers receive a "Confidential Case History" that contains information about the insured's illness and life expectancy, the policy's grade, value, and annual premium payment, and the amount Life Partners has escrowed to make those premium payments. The purchasers never learn the identities, addresses, or other personal information about the insureds.[6] Life Partners may provide the purchasers with updates on an insured's medical condition or life expectancy, but sometimes it may simply "lose contact with the insured."

When Life Partners purchases a policy, it becomes the legal owner but appoints a trustee to serve as the beneficiary. To cover the future premiums, Life Partners places what it projects to be a sufficient amount in escrow and then pays the annual premiums from that account. If the insured survives longer than projected, however, and the escrowed amount is depleted, Life Partners will require the purchasers to provide additional funds. If the purchasers fail to provide additional funds to cover the premiums, the policy will be forfeited along with any anticipated return. Life Partners retains at least some discretion over the payments of premiums, however, and at times may itself pay premiums to prevent the forfeiture of a policy when an insured outlives a projected life expectancy. There is also some evidence in the record that, on at least one occasion,

---

[6] Since 2011, the Texas Insurance Code has specifically regulated transactions between a "provider" of life settlement agreements, like Life Partners, and the insureds from whom the providers purchase the insurance policies. *See* TEX. INS. CODE §§ 1111A.001–.026 (the Texas Life Settlements Act). Among other requirements, this Act requires providers or their brokers to be licensed by the State, *id*. § 1111A.003; to use forms and disclosures approved by the State, *id*. § 1111A.005; to submit annual statements to the State, *id*. § 1111A.006; to make certain disclosures to the insured, *id*. § 1111A.007; and with limited exceptions, to avoid any disclosure of "the identity of an insured . . . or the insured's financial or medical information to any other person," *id*. § 1111A.006(d). The Life Settlements Act, however, regulates only the transaction between the insured and the provider; it does not regulate the relationships or transactions between the providers and those to whom they sell interests in the policies they purchase.

Life Partners elected to "optimize" a policy's premiums to get "more years of premium coverage with the same amount of money" and thereby protect the purchasers' investments. To accomplish this, Life Partners exercised discretion to prepay premiums, while leaving sufficient funds in the escrow account to maintain federal insurance coverage on the funds in that account. As Life Partners explained the process,

> because the prepayment would be in excess of the cost of insurance, the amount paid in would pay the policy to a date farther in the future than if premiums were only paid on an annual basis. Thus, the necessity of a premium call would be reduced in the event the insured outlived his or her life expectancy because of the additional amount earned by prepayment. Finally, there would remain in escrow $250,000 which would not begin to be used until the value from the prepayment had been exhausted.

This "optimization" of premiums, however, can also reduce the purchasers' return if the insurance company refuses to refund any unused premiums.

Life Partners is responsible for monitoring the insureds. Once an insured dies, Life Partners must obtain the death certificate, submit a claim to the life insurance company, and facilitate the payment of the benefits. When the insurance company pays the benefits to the trustee whom Life Partners has designated as the beneficiary, either the trustee or Life Partners then distributes the funds to the purchasers according to their fractional interests. Life Partners acknowledges that purchasers rely on Life Partners both before and after they purchase their interests. As its form entitled "Life Settlement Risk Factors–Read Before You Invest" explains:

> **You will be dependent upon LPI and the Escrow Agent for premium administration, tracking, and policy benefit collection services.**
>
> LPI and the Escrow Agent will administer the premium payments on the policies purchased, and you will be dependent upon them to ensure timely payment of these premiums. If the funds that have been set aside in escrow to pay premiums are exhausted, you will be dependent upon LPI and the Escrow Agent to notify you of the premiums due, collect the additional premium payments from you and the other investors, and to pay the premiums promptly.

6

Additionally, as the Escrow agent will be named as beneficiary of the policy to collect the death benefit and distribute the death benefit proceeds upon death of the insured, you will be dependent upon LPI to notify the Escrow Agent of the death of the insured and facilitate the payout of the policy, and upon the Escrow Agent to distribute the death benefits to you and the other investors in the policy.

As with any administrative task, there is always a risk that some aspect of this administration could go awry for currently unknown reasons. *If these administrative tasks are not completed properly, a life settlement policy could lapse and you could lose your interest in the policy*.

(Emphasis added.)

To facilitate Life Partners' efforts on the purchasers' behalf, each purchaser must execute a Power of Attorney that appoints Life Partners as the purchaser's "true and lawful agent and attorney . . . for its use and benefit to":

a. Enter into any agreements or contracts necessary for the purchase of life insurance policies . . . [;]

b. Enter into all documents necessary to facilitate the purchase of the designated policy(cies) . . . [;]

c. File, complete and record any document reflecting the transfer of ownership . . . [;]

d. Notify the Purchaser of any amount necessary to replenish the Premium Escrow Account from which premium payments are made . . . [;]

. . .

f. Obtain proof of death of the insured and instruct Escrow Agent regarding the filing of death claims and the payment of death benefits of matured policies to the Purchaser or the Purchaser's designee . . . [; and]

g. Advance, at the discretion of Agent, any funds which may be necessary to replenish the Premium Escrow Account from which premium payments are made . . . .

Because the purchasers do not have legal title to the insurance policy and there is no secondary market for their interests, they must rely on Life Partners to coordinate a sale to another interested purchaser if they need or decide to divest.

7

## II.
## "Securities"

We must decide whether Life Partners' life settlement agreements are "securities" under the Texas Securities Act, TEX. REV. CIV. STAT. art. 581-1 to -43.[7] The Act defines the terms "security" and "securities" broadly, to include such things as "any limited partner interest in a limited partnership, share, stock, treasury stock, . . . *investment contract*, or any other instrument commonly known as a security, whether similar to those herein referred to or not." *Id*. art. 581- 4.A (emphasis added). The Arnolds and the State contend that Life Partners' life settlement agreements are "investment contracts," and thus "securities," under the Act.

Because this case requires us to construe a statute, we would normally follow our well-established text-based approach to interpret the meaning of "investment contract." This Court, however, has previously considered and addressed the meaning of the term "investment contract" as it appears in the Texas Securities Act. *See Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637, 639 (Tex. 1977). Noting in *Searsy* that the term "appear[s] to have been taken from an almost identical definition of 'security' in the Federal Securities Act of 1933," we looked to federal cases and other authorities for guidance in construing the term. *Id*. (citing 15 U.S.C. § 77b(1)). As discussed below, both before and since our decision in *Searsy*, the United States Supreme Court, numerous federal courts, and many state courts have undertaken to interpret and apply the term

_____

[7] The Texas Securities Act prohibits selling or offering for sale "any securities . . . until the issuer of such securities or a dealer registered under the provisions of this Act shall have been granted a permit by the Commissioner." *Id*. art. 581-7.A(1). The Act also prohibits any person from offering or selling "a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." *Id*. art. 581-33.A(2). Any person who offers or sells "a security" in violation of either of these provisions "is liable to the person buying the security . . . , who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id*. art. 581-33.A(1), (2). In addition, the Act obligates the Attorney General "to take such measures and to make such investigations as will prevent or detect the violation of any provision thereof." *Id*. art. 581-3. The Arnolds and the State sued Life Partners for violating these provisions, and they concede that Life Partners has no liability under these provisions unless its life settlement agreements are "securities."

8

"investment contract" as it appears in various securities acts. American courts have thus developed a significant body of law on the topic, and while these courts have not always agreed, their decisions have served as a guide to the meaning and application of the term "investment contract" in the securities-law context throughout the country. In light of this distinct and developed body of judicial precedent and consistent with this Court's prior reliance on such authorities, we will continue to seek guidance from these decisions as we construe the Texas Securities Act here.[8]

Based on these authorities and our own reading of the statute's language, we conclude that three key principles must guide our construction and application of the term "investment contract." First, we must broadly construe the term to maximize the protection the Act is intended to provide to the investing public. Second, we must focus on the economic realities of the transaction at issue. And third, if the economic realities establish that a transaction is an investment contract, we must apply the statute regardless of any labels or terminology the parties may have used. In light of these principles, we conclude that an "investment contract" for purposes of the Texas Securities Act means (1) a contract, transaction, or scheme through which a person pays money (2) to participate in a common venture or enterprise (3) with the expectation of receiving profits, (4) under circumstances in which the failure or success of the enterprise, and thus the person's realization of the expected profits, is at least predominately due to the entrepreneurial or

---

[8] We do not mean to suggest that we can or will ignore the statutory language at issue. When we construe and apply statutes, it is always "our goal . . . to ascertain and give effect to the Legislature's intent," which we draw "from the plain meaning of the words chosen by the Legislature when it is possible to do so." *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012) (citing *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009)). When the "statutory text is clear, that text is determinative of legislative intent unless the plain meaning of the statute's words would produce an absurd result," but "when statutory text is susceptible of more than one reasonable interpretation it is appropriate to look beyond its language for assistance in determining legislative intent." *Id*. Here, we find the term "investment contract" to be less than clear, and thus look for assistance to other courts that have as a whole construed the same language appearing in the same statutory context. Like those courts, we find that the statute expresses a clear intent that it be construed broadly to effectuate its remedial purpose. *See* TEX. REV. CIV. STAT. art. 581-4.A (defining "securities" to include "any other instrument commonly known as a security, whether similar to those herein referred to or not").

managerial, rather than merely ministerial or clerical, efforts of others, regardless of whether those efforts are made before or after the transaction. Applying this definition to the undisputed material facts, we conclude that Life Partners' life settlement agreements are "investment contracts" and thus "securities" under the Texas Securities Act.

## A.        Guiding Principles & the *Howey/Forman* Test

The United States Supreme Court first addressed the meaning of "investment contract," as used in the federal Securities Act of 1933, over 70 years ago. *S.E.C. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) (citing 15 U.S.C. § 77b(1)). Noting that the act included "investment contract" as just one of an extensive list of the different types of transactions that constitute "securities," the Court remarked that "the reach of the [a]ct does not stop with the obvious and commonplace." *Id*. at 351. Instead, "[n]ovel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as [a] matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,'" or as "'any interest or instrument commonly known as a 'security.'" *Id*. (quoting 15 U.S.C. § 77b(1)). "The test" the Court described for determining whether a transaction is an investment contract "is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Id*. at 352–53. Applying this test, the Court concluded that the defendants' assignments of their rights under oil leases in exchange for a small payment coupled with the purchaser's agreement to pay the defendants to drill a test well on the leased acreage was "a form of investment contract in which the purchaser was paying both for a lease and for a development project." *Id*. at 349.

Three years later, the Supreme Court addressed the issue again in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). The defendants in *Howey* offered and sold portions of a large citrus

10

grove, "coupled with a contract for cultivating, marketing and remitting the net proceeds to the investor." *Id*. at 294. The issue, as the Court described it, was "whether, under the circumstances, the land sales contract, the warranty deed and the service contract together constitute an 'investment contract' within the meaning of" the federal securities act. *Id*. at 297. The Court noted that, although the federal act did not define the term "investment contract," some state courts had already developed a definition when construing their state securities acts even before Congress adopted the federal statute in 1933. *Id*. at 298. Although the state statutes did not define the term either, the Court noted that state courts "broadly construed" the term "so as to afford the investing public a full measure of protection." *Id*. The Court observed that the state courts that addressed the issue disregarded "form" for "substance," emphasized the "economic reality" of the transactions, and "uniformly" defined an "investment contract" as "a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'" *Id*. (quoting *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920)).

Drawing from these state court constructions, and based on its presumption that Congress was aware of these constructions when it adopted the federal act, the Court announced the following definition: "an investment contract for purposes of the [Federal] Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id*. at 298–99. The Court concluded that the citrus orchard purchases at issue in *Howey* "clearly involve investment contracts as so defined," because the defendants were offering not just "fee simple interests in land" or even an "orchard coupled with management services," but "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by [the defendants]." *Id*. at 299. Finding that "[t]he investors provide the capital and share in the

11

earnings and profits[, and] the promoters manage, control and operate the enterprise," the Court concluded that the transactions were "investment contracts" under the federal act, "regardless of the legal terminology in which such contracts [were] clothed." *Id*. at 300.

The Supreme Court has had occasions to apply and clarify the *Howey* test over the past 70 years. In *United Housing Foundation Inc. v. Forman*, for example, the Court considered the sales of "shares of stock" that entitled the purchasers to lease an apartment in a state subsidized and supervised nonprofit housing cooperative. 421 U.S. 837, 840 (1975). As in *Howey*, the Court explained that Congress "sought to define the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." *Id*. at 847–48 (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)). But the Court rejected the notion that the parties' labeling of the transaction as a sale of a "share of stock" was sufficient to make it a "securities" sale, even though the act defines "security" to include any "share [or] stock," because "Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto." *Id*. at 849.

Addressing whether the purchase of a "share of stock" in the co-op was an "investment contract," the Court "examine[d] the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties." *Id*. at 851. After reciting the *Howey* test as "the basic test for distinguishing the transaction from other commercial dealings," the Court restated the test slightly, explaining that "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the *entrepreneurial or managerial efforts of others*." *Id*. at 852 (emphasis added). Because the purchasers in *Forman* "were attracted solely by the prospect of acquiring a place to live, and not

by financial returns on their investments," *id.* at 853, the Court concluded that "the inducement to purchase" the shares was "not to invest for profit," *id.* at 851, and thus "the disputed transactions are not purchases of securities within the contemplation of the federal statutes," *id.* at 847.

The Supreme Court addressed the meaning of "investment contract" again in *Reves v. Ernst & Young*, 494 U.S. 56 (1990). In *Reves*, the Court considered whether "certain demand notes" issued by a farmers' cooperative were "securities" under the federal securities acts. *Id.* at 58. Again, the Court began its analysis by noting that "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called," and explaining that the Court was "not bound by legal formalisms, but instead [must] take account of the economics of the transaction under investigation." *Id.* at 61. The Court explained that a note is "likely to be a 'security'" if "the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Id.* at 66. But "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'" *Id.* The Court concluded that the notes at issue in *Reves* were securities under the federal securities act. *Id.*

More recently, the Court addressed whether an investment transaction that promises a fixed rate of return, rather than a variable or uncertain rate, can be an investment contract. *S.E.C. v. Edwards*, 540 U.S. 389, 397 (2004). In *Edwards*, the defendants offered and sold public payphones, along with agreements to immediately lease the payphones back from the purchasers for five years, to manage and service the payphones throughout the lease term, and then to buy the payphones back for the original purchase price when the lease terminated, or sooner upon the

13

purchaser's request. *Id*. at 391. Based on the original purchase price and the fixed monthly lease-back rate, the purchasers would receive a fixed 14% annual return on their purchase. *Id*. As in *Forman*, the Court explained that "[t]he 'touchstone' of an investment contract [is] 'the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" *Id.* at 395 (quoting *Forman*, 421 U.S. at 852). The Court rejected the defendants' argument that

> including investment schemes promising a fixed return among investment contracts conflicts with our precedent, [because] when we held [in *Howey*] that "profits" must "come solely from the efforts of others," we were speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest. We used "profits" in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment.

*Id*. at 394–95. The Court concluded that the investment scheme was a security under the federal act. *Id.* at 397.

When we addressed the meaning of "investment contract" in *Searsy*, we adopted the Supreme Court's *Howey* test, as restated in *Forman*, as the basis for determining whether a transaction is an "investment contract," and thus a "security," under the Texas Securities Act. *Searsy*, 560 S.W.2d at 640–41. We have described the Supreme Court's decisions in some detail here, however, because in addition to providing the relevant test, they also describe the proper *approach* to the term's construction.

We derive from these cases three key principles to guide our application of the *Howey/Forman* test to any particular transaction. First, we must "broadly construe[ ]" the term "investment contract" to maximize the protection the Act is intended to provide to the investing public. *Howey*, 328 U.S. at 298. Second, we must focus on the "economic realities" of the transaction to determine whether it meets the test's requirements. *Reves*, 494 U.S. at 61; *Forman*, 421 U.S. at 849; *Howey*, 328 U.S. at 298. And third, if the "economic realties" satisfy the

14

requirements, we must conclude that the transaction is an "investment contract" regardless of the labels or terminology the parties used to describe it. *Reves*, 494 U.S. at 61; *Forman*, 421 U.S. at 851−52; *Howey*, 328 U.S. at 300. Following the lead of numerous other courts,[9] we accept and apply these guiding principles when using the *Howey/Forman* test to determine whether a transaction constitutes an "investment contract."

## B.      "Profit from the Efforts of Others"

When the Supreme Court announced the *Howey* test, it stated that a transaction is an "investment contract" under the federal securities act only if the person investing in a common enterprise is led to expect profits "solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298−99. Subsequent decisions have transformed this original articulation of the test, however, particularly with regard to (1) whether the profits must come "solely" from the efforts of others, and (2) the kinds of "efforts" of promoters and others on which the purchasers must rely. As both issues are relevant to our resolution of this case, we must consider these cases as well.

### 1.      "Solely" from the efforts of others

The federal Ninth Circuit Court of Appeals was one of the first courts to question whether the *Howey* test actually requires (or should actually require) that the profits the purchaser expects from the transaction come "solely" from the efforts of others. *S.E.C. v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476 (9th Cir. 1973). The transactions at issue in *Turner Enterprises* involved the sale of opportunities to attend motivational seminars and receive self-help materials and then sell

---

[9] *See, e.g.*, *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993) (observing that "the Supreme Court cases mark out a *concept*, not a precise definition," and require that the term "securities" be "flexibly applied to capture new arrangements comprising the essence of securities, however they may be named") (citing *Joiner Leasing*, 320 U.S. at 351); *McCown v. Heidler*, 527 F.2d 204, 208 (10th Cir. 1975) (following a "flexible approach" that depends "not upon the form, but upon the substance and economic reality of the transaction in question") (citing *Forman*, 421 U.S. 837); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1035 (2d Cir. 1974) (noting that "the federal securities laws are to be construed 'not technically and restrictively, but flexibly to effectuate (their) remedial purposes'") (quoting *S.E.C. v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 195 (1963)).

the same opportunities to others who would do the same, in a pyramid-type scheme. *Id*. at 478. After quoting the "now familiar" *Howey* test, *id*. at 481, the Ninth Circuit noted that the purchasers in *Turner Enterprises* would only make money if they themselves "find prospects," "persuade them to attend" meetings, and convince them to "purchase a plan." *Id.* at 482. Thus, the court acknowledged, "it can be said that the returns or profits are not coming 'solely' from the efforts of others." *Id*.

Nevertheless, the court concluded that the transactions were investment contracts, holding that "the word 'solely,'" as used in the *Howey* test, "should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities." *Id.* Consistent with the three guiding principles we have identified, the court justified its modification of the *Howey* test "in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of securities should be a flexible one." *Id.* Otherwise, the court reasoned, the test, and thus the statute's requirements, "would be easy to evade by adding a requirement that the buyer contribute a modicum of effort." *Id*. Since that "would not serve the purpose of the legislation," the court adopted a "more realistic test," encompassing transactions that may depend in part on the investor's "efforts," so long as the "efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id*.

A year later, the Fifth Circuit Court of Appeals adopted the Ninth Circuit's modified version of the *Howey* test when addressing a scheme involving "a multi-level network of independent distributors, purportedly engaged in the business of selling a line of cosmetics." *S.E.C.*

16

*v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 475 (5th Cir. 1974). Focusing on the "recruitment aspects of [the] enterprise," as opposed to the marketing of cosmetics, the court quoted the *Howey* test, but concluded that "[a] literal application of the *Howey* test would frustrate the remedial purposes of the Act." *Id.* at 477, 480. Because "[t]he admitted salutary purposes of the Acts can only be safeguarded by a functional approach to the *Howey* test," the court held that "the proper standard in determining whether a scheme constitutes an investment contract is that explicated by the Ninth Circuit" in *Turner Enterprises*; that is, "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 480, 483 (quoting *Turner Enters.*, 474 F.2d at 482).

The Fifth Circuit noted in *Koscot* that "a significant number of federal courts invoking the *Howey* test [had] either given it a broader more salutary application or endorsed such an application in principle." *Id.* at 481. Other courts soon followed suit. *See, e.g.*, *McCown v. Heidler*, 527 F.2d 204, 211 (10th Cir. 1975) (quoting *Turner Enterprises* test and stating that "it has been widely held that . . . reliance of the investor on the promoter need not be total"). In doing so, some found support for the modification in the fact that the Supreme Court had omitted the word "solely" when it restated the *Howey* test in *Forman*, to require "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." 421 U.S. at 852; *see, e.g.*, *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981) (quoting *Forman* and noting that "the Supreme Court has altogether omitted the word 'solely' in its most recent formulation of the investment contract definition"). These courts thus concluded, as stated in *Williamson*, that, "[a]lthough the Court used the word 'solely' in the *Howey* decision, it should not be interpreted in the most literal sense," because "[t]he Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the

17

definitions of the various types of securities should not hinge on exact and literal tests." 645 F.2d at 418.

We adopted the same approach in *Searsy*, two years after the Supreme Court decided *Forman*. *Searsy*, 560 S.W.2d at 639–41. *Searsy* was a class action seeking rescission and damages against two corporations that sold commodity options. *Id*. at 638 (explaining the defendants' "business of selling 'puts,' 'calls,' and 'double options' on commodity futures contracts"). Observing that the *Howey* test was "widely accepted in state and federal cases," we restated it as containing "four requirements: (1) investment of money; (2) a common enterprise; (3) expectation of profits; (4) solely from the efforts of others." *Id*. at 640. We quoted the "solely" language from *Howey*, but we noted that the word "solely" suggests that "[t]he investor was required to have exerted no effort with regard to the investment." *Id*. at 641. We concluded that "[t]he more recent trend, . . . and in our view the more reasonable approach, is to use a more realistic test which inquires whether the investor made any *significant* efforts." *Id*. (emphasis added). Relying in part on the Ninth Circuit's reasoning in *Turner Enterprises*, we reasoned that "[t]he 'solely from the efforts of others' requirement could be easily evaded by requiring the investor to exert some modicum of effort, such as picking one orange in the *Howey* citrus groves. This would be a blind and mechanical view of what constitutes an investment contract." *Id.* We thus agreed that the "more realistic test" is "whether the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id*. (quoting *Turner Enters.*, 474 F.2d at 482). Using this test, we held that the commodity options at issue were "investment contracts," and thus "securities," under the Texas Securities Act. *Id*. at 638.

Since our decision in *Searsy*, numerous other courts have also adopted this "more realistic"

18

version of the *Howey/Forman* test. *See, e.g.*, *S.E.C. v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992) (concluding *Howey/Forman* test met because "profits for . . . investors are expected to accrue, if not solely, at least predominantly from the efforts of others"); *Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918, 920 (4th Cir. 1990) ("Despite the restrictive language of the third prong of the test, later courts have explained that a program requiring some effort from the investor may still constitute an 'investment contract,' but the most essential functions or duties must be performed by others and not the investor."). We are not aware, in fact, of any jurisdiction that continues to require that profits result "solely" from the efforts of others. Instead, even if the purchaser's profits depend in part on the purchaser's own efforts, a transaction will satisfy the "efforts" element of the *Howey/Forman* test if the efforts of others "are undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Searsy*, 560 S.W.2d at 641.

## 2. "Efforts" of others

The "efforts" that the Supreme Court concluded met the test in *Howey* included the defendant's work to cultivate and market the citrus crops and otherwise "manage, control and operate the enterprise." *Howey*, 328 U.S. at 294, 300. After the Ninth Circuit held in *Turner Enterprises* that the "efforts" that count "are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," 474 F.2d at 482, the Supreme Court included similar language when it restated the test in *Forman*, referring to "the entrepreneurial or managerial efforts of others." 421 U.S. at 852. That same year, we used the *Turner Enterprises* language in *Searsy*, concluding that the kinds of efforts that are "significant" when applying the test are "essential managerial efforts." *Searsy*, 560 S.W.2d at 641 (citing *Turner Enters.*, 474 F.2d at 482). We noted in that case that the defendant's "personnel frankly testified

19

that customers were not supposed to understand the . . . business operation," that the defendant's salesmen "advised the customer what to do," and that, "[a]lthough the final decision was left to the customer, he rarely had any choice but to follow the advice given him." *Id.* Finding that the defendant's actions constituted "essential managerial efforts," we concluded "that the commodity options sold . . . in this case meet the requirements of an 'investment contract,' as set forth in the *Howey* test." *Id.*

Several other courts have since expanded on the types of "efforts" that qualify as "significant" under the *Howey/Forman* test and those that do not. Since the purchaser need not rely "solely" on others' efforts, the courts have considered the purchasers' activities as well as those of the sellers. Specifically, they have looked to determine whether the purchaser enjoyed or exercised control over the asset or the operations of the enterprise, such that the purchaser would fulfill a "managerial" or "operational" role. *See, e.g.*, *Banghart v. Hollywood Gen. P'ship*, 902 F.2d 805, 807 (10th Cir. 1990) ("Courts which have considered the issue have uniformly held that general partnerships are not investment contracts because the partners—the investors—are ordinarily granted significant control over the enterprise."). As the Fifth Circuit explained:

> *Howey* teaches that [a transaction] is a security only if the holder is relying on the managerial skills of others to generate his profit. By implication, if the holder is relying on his own entrepreneurial talents to generate his profit, his interest is not treated as a security because he does not fall within the class of persons Congress meant to protect when it included non-traditional securities in the coverage of the securities laws.

*Siebel v. Scott*, 725 F.2d 995, 999 (5th Cir. 1984).

In some cases, the courts considered whether the purchaser retains *the right* to control the asset or enterprise. *See, e.g.*, *Williamson*, 645 F.2d at 421 ("So long as the investor has the right to control the asset he has purchased, he is not dependent on the promoter or on a third party for 'those essential managerial efforts which affect the failure or success of the enterprise.'"). But

most courts appear to have focused on whether, as an "economic reality," the purchaser in fact did exercise managerial or entrepreneurial control, or instead relied on others to do so. *See, e.g.*, *Siebel*, 725 F.2d at 998 ("There is no evidence that any of the limited partners planned or desired to participate in the operation of the cable television system."). This is in essence the approach that we followed in *Searsy*. 560 S.W.2d at 641 (noting that, "[a]lthough the final decision was left to the customer, he rarely had any choice but to follow the advice given him").

In light of the Supreme Court's admonition to "broadly construe" the act in recognition of the "economic realities" of a transaction, we are not alone in this approach. For example, in *Long v. Shultz Cattle Co.*, 881 F.2d 129 (5th Cir. 1989), the Fifth Circuit acknowledged that the plaintiffs, who invested in a cattle-raising operation, "had a substantial degree of theoretical control over their investment. They could, theoretically, move their cattle to a different feedyard, decide what to feed them, provide their own veterinary care, or seek buyers on their own," and in fact they "were *required* to authorize every management decision involving their cattle." *Id.* at 134. But "the evidence [was] undisputed that at each juncture plaintiffs relied solely on the [seller's] advice" and followed all of the seller's recommendations. *Id.* Thus, "even if [the purchasers] technically made the key management decisions, they simply rubber-stamped [the seller's] recommendations and relied entirely on [the seller's] efforts and expertise to manage the underlying venture." *Id.* at 136. Following the Supreme Court's "flexible approach" to construction of the statute, the Fifth Circuit concluded that it was "impossible to conclude that the . . . *Howey* [test] is not satisfied without ignoring entirely the economic realities of [the seller's] program." *Id.*

The cases thus indicate that, to constitute an investment contract under the "efforts" aspect of the *Howey/Forman* test, the transaction must be such that, in reality, the seller, or another party

21

other than the purchaser, exercises the predominate managerial or entrepreneurial control on which the purchaser's anticipation of profits is based.[10] Conversely, courts have recognized that control over merely "ministerial" or "clerical" functions does not constitute the kind of "significant efforts" that satisfy the *Howey/Forman* test. *See, e.g.*, *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 914–15 (8th Cir. 1976) ("Where the investors' duties were nominal and insignificant, their roles were perfunctory or ministerial, or they lacked any real control over the operation of the enterprise, the courts have found investment contracts."); *see also Martin v. T. V. Tempo, Inc.*, 628 F.2d 887, 890 (5th Cir. 1980) (noting purchaser's argument that transactions were investment contracts because "only simple ministerial tasks were required on the part of plaintiffs"); *Koscot Interplanetary*, 497 F.2d at 485 (concluding that the purchaser's "act of consummating a sale is essentially a ministerial not managerial one").

Because the *Howey/Forman* test does not strictly require that the purchaser rely "solely" on the efforts of others, courts must apply the distinction between "managerial or entrepreneurial control" and "perfunctory or ministerial duties" to the activities of both the purchasers and the sellers in any given transaction. If, for example, both parties exert "efforts" to support the enterprise but the purchaser's efforts are "purely ministerial," those efforts are not "significant" and the "efforts" aspect of the *Howey/Forman* test will typically be met. *See, e.g.*, *Mitzner v. Cardet Int'l, Inc.*, 358 F. Supp. 1262, 1268 (N.D. Ill. 1973) (noting that "the efforts of the franchisee-licensee in this case appear to be purely *ministerial*").[11] But if *the seller's* efforts are

---

[10] *See also Bailey*, 904 F.2d at 923 ("We agree with the district court that the plaintiffs had the *authority* to exercise some control over their individual investments. They could choose the embryos they wished to purchase and direct the feeding practices and marketing of their cattle or terminate the management agreement with Albemarle Farms. When viewed in light of the surrounding circumstances, however, the plaintiffs had little to no control over the ultimate success or failure of their investments.").

[11] The distinction between "entrepreneurial or managerial" efforts and "ministerial and clerical" efforts grows out of and accommodates courts' acceptance of the idea that the purchaser need not rely "solely" on the efforts of

ministerial and perfunctory, rather than managerial or entrepreneurial, the purchaser cannot be said to be relying on the seller's efforts for the anticipated profits, and the test is not met. *See, e.g.*, *McConathy v. Dal Mac Commercial Real Estate, Inc.*, 545 S.W.2d 871, 875 (Tex. Civ. App.—Texarkana 1976, no writ) (noting that "[t]he only management on the part of the managing venturer . . . was that of insuring the property, paying the taxes and the like—not for profit, but solely to protect and preserve the investment").

## C.     Pre-purchase versus Post-purchase Efforts

Early cases applying the *Howey/Forman* test generally focused on the efforts and control that the parties exercised *after* the transaction occurred. *See, e.g.*, *McConathy*, 545 S.W.2d at 875 (noting that "no development or operations *were to be undertaken* with regard to the property") (emphasis added). In the 1990s, however, Life Partners faced the issue of whether the efforts it exerted *before* the transaction were relevant to the *Howey/Forman* analysis. *S.E.C. v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996). The SEC argued that Life Partners' purchasers "are essentially passive," and rely for their anticipated profits on Life Partners' "pre-purchase expertise in identifying existing policyholders and . . . post-purchase management of the investment." *Id*. at 545. The D.C. Circuit rejected the SEC's position, holding first that all of Life Partners' post-purchase efforts—"holding the policy, monitoring the insured's health, paying premiums,

---

others. *See, e.g.*, *Slevin v. Pedersen Assocs., Inc.*, 540 F. Supp. 437, 440 (S.D.N.Y. 1982) (stating that whether a transaction is an investment contract "depend[s] on whether 'solely' is interpreted literally (i.e., did plaintiff contribute in any manner to the project) or liberally (i.e., did the plaintiff provide only ministerial, nonmanagerial help)"). If the purchaser had to rely "solely" on the efforts of others, such that any efforts by the purchaser would prevent the transaction from being an investment contract, it would not matter whether the efforts of others were managerial or merely ministerial. But since the purchaser's own efforts to support the enterprise will not necessarily prevent the transaction from being an investment contract, the managerial-ministerial distinction is helpful to determine whether the purchaser is in fact relying on the efforts of others to obtain the anticipated profit. *See, e.g.*, *Wieboldt v. Metz*, 355 F. Supp. 255, 261 (S.D.N.Y. 1973) (concluding that the purchaser's "given role was not essentially ministerial, but truly active and discretionary" and "gave him virtually unfettered control, a situation which is irreconcilable . . . with *Howey's* definition of an investment contract").

converting a group policy into an individual policy where required, filing the death claim, collecting and distributing the death benefit (if requested), and assisting an investor who might wish to resell his interest"—were merely ministerial or clerical, rather than managerial or entrepreneurial. *Id*. at 545–46. These post-purchase efforts, the court found, have no "material impact upon the profits of the investors." *Id*. at 546. "[O]nce the transaction closes, the investors do not look to the efforts of others for their profits because the only variable affecting profits is the timing of the insured's death, which is outside of [Life Partners'] control." *Id*. at 545.

The court then addressed the SEC's reliance on Life Partners' pre-purchase efforts, which it described as efforts "to locate insureds and to evaluate them and their policies, as well as to negotiate an attractive purchase price." *Id*. at 547. Although the court agreed that these efforts were "undeniably essential to the overall success of the investment," the court expressed its "doubt that pre-purchase services should ever count for much," and concluded that, in this case, the "pre-purchase services cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others." *Id*. Asserting the lack of any authority finding an "investment contract" based solely on pre-purchase efforts, the court reasoned that such efforts do not justify the federal securities act's disclosure requirements because

> the value of the promoter's efforts has already been impounded into the promoter's fees or into the purchase price of the investment, and if neither the promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then the need for federal securities regulation is greatly diminished.

*Id*. Because "it is the length of the insured's life that is of overwhelming importance to the value of the viatical settlements," the court concluded, the SEC had failed to "show that the promoter's efforts have a predominant influence upon investors' profits." *Id*. at 548.

One judge dissented from the D.C. Circuit's decision. *Id*. at 549 (Wald, J., dissenting). The dissenting opinion began by describing three "background principles [that] should guide our

analysis": (1) "we should . . . apply securities laws flexibly so as to achieve their remedial purposes," (2) "the securities laws do not grant federal protection to all investments, but only to that subcategory of investments that are securities," and (3) the securities laws "embody the belief that information is the most important form of investor protection." *Id*. at 549–50. Acknowledging that the anticipated profits must come "'predominately,' but not solely," from the seller's efforts, and that the seller's efforts "must be of a managerial or entrepreneurial character, and not merely ministerial or clerical," the dissent concluded that the court's "bright-line rule" rejecting the relevance of pre-purchase activities "elevates a formal element, timing, over the economic reality of the investors' dependence on the promoter. Even more troubling, the majority's approach undercuts the flexibility and ability to adapt to 'the countless and variable schemes' that are the hallmarks of the *Howey* test." *Id*. at 550–51.

The dissent vigorously disagreed with the majority's assertion that no precedent supported her application of the *Howey/Forman* test, and cited to numerous cases in which lower courts had relied on the promoters' pre-purchase activities to determine whether a transaction constituted an investment contract. *Id.* at 552–53. She noted, for example, that the Second Circuit had found in *Glen-Arden Commodities* that the "investors' profits depended on the promoter's expertise in selecting whiskey for [the] investors to purchase as well as on the promoter's promise to buy back the whiskey in the future." *Id.* (citing *Glen-Arden Commodities*, 493 F.2d at 1035). More recently, she noted, the Second Circuit had found "an investment contract where [the] promoter both promised to maintain a secondary market for CDs—a post-purchase managerial activity—and used its market power to negotiate favorable CD rates with participating banks—a pre-purchase activity." *Id.* (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240–41 (2d Cir. 1985)). In addition, the dissent noted, the Eleventh Circuit had

25

"emphasiz[ed] [the] promoter's claimed expertise in locating bargain-priced Florida properties for [the] investor to purchase, as well as [the] promoter's post-purchase activities," when concluding that the promoter was not entitled to summary judgment on the "question of whether [an] investment contract existed." *Id.* (citing *Gordon v. Terry*, 684 F.2d 736, 740 n.4, 742–43 (11th Cir. 1982)). Contrary to the majority's assertion, the dissent concluded that "courts frequently refer to pre-purchase as well as post-purchase activities of the promoter in finding *Howey*'s third prong met." *Id*. at 552–53.[12]

Rejecting the majority's conclusion that pre-purchase efforts "should be categorically excluded," the dissent asserted that "the *Howey* test can be met by pre-purchase managerial activities of a promoter when it is the success of these activities, either entirely or predominantly, that determines whether profits are eventually realized." *Id.* at 551.[13] Because the purchasers' profits depended on whether Life Partners selected the right life insurance policies, negotiated the right price, and accurately predicted the insured's life expectancy, the dissent would have concluded that Life Partners' "viatical settlements represent one of the rare instances where investor profits depend predominantly on the pre-purchase managerial activities of a promoter." *Id*. at 555. Under her "approach, since the investors' profits depend entirely on managerial

---

[12] The dissent cited several additional cases as support for her reliance on pre-purchase activities. *Id.* at 553 (citing *S.E.C. v. Brigadoon Scotch Distributions, Ltd.*, 388 F. Supp. 1288, 1293 (S.D.N.Y. 1975) (in which, as Judge Wald explained, "the court specifically stated that the promoter's [pre-purchase] selection activities alone were sufficient to satisfy *Howey*'s third prong because '[c]oins do not appreciate in value at the same rate and accordingly their selection is the most crucial factor in determining how much profit an investor in coins will make'"); *Bailey*, 904 F.2d at 924–25) (which, as Judge Wald explained, emphasized the value to the investment of "the promoter's pre-purchase activity of selecting and crossbreeding [cattle] embryos"); and *S.E.C. v. Energy Grp. of Am., Inc.*, 459 F. Supp. 1234, 1241 (S.D.N.Y. 1978)) (which, as Judge Wald explained, concluded that investment contract may be based on "purchase of property in expectation that it will appreciate due to promoter's expertise in selecting the property")).

[13] The dissent agreed that "*Howey*'s third prong would not be satisfied whenever the promoter's managerial activities occurred prior to purchase and the realization of profits depended significantly on outside forces, such as a lottery." *Id.* at 552.

activities of the promoter, the *Howey* test is met and [Life Partners'] viatical settlements should be subject to the securities laws." *Id.* at 556.

Following the D.C. Circuit's *Life Partners* decision, courts in other jurisdictions reached different conclusions on the issue of whether life settlement agreements can be "investment contracts" based on the promoter's pre-purchase efforts.[14] During this time, the Waco Court of Appeals became the first Texas appellate court to address the issue in *Griffitts v. Life Partners, Inc.*, No. 10-01-00271-CV, 2004 WL 1178418 (Tex. App.—Waco May 26, 2004, no pet.) (mem. op.). Like the D.C. Circuit, the Waco court concluded that Life Partners' life settlement agreements were not investment contracts. *Id.* at *2. Addressing Life Partners' post-purchase efforts, "such as paying the policy premiums and filing evidence of death with the insurance company," the court found that Life Partners merely "holds an investment in anticipation of appreciation or maturity," and performed only "ministerial functions" that "could have no effect on the profitability of the policies, which was overwhelmingly determined by how long the insured lived." *Id.*

Addressing Life Partners' pre-purchase efforts, "such as locating, researching, and evaluating the policies," the court concluded that these actions were analogous to those of the land

---

[14] In Ohio, for example, a state court of appeals concluded that the viatical settlements at issue were not investment contracts because the promoter's post-purchase efforts "cannot increase the value of the investor's interests" and the only variable that can impact the profitability of the viatical settlements at issue is the timing of the death of the insured. *Glick v. Sokol*, 777 N.E.2d 315, 319 (Ohio Ct. App. 2002). The following year, however, another Ohio court of appeals concluded that the viatical settlements at issue were investment contracts, in part because the investors "had no control over the selection of people whose policies were purchased, the prices paid for the policies, the escrow agent who would hold the funds, or any other managerial decision of the company." *Rumbaugh v. Ohio Dep't of Commerce*, 800 N.E.2d 780, 787 (Ohio Ct. App. 2003). In concluding that the promoter's pre-purchase efforts were relevant to the analysis, the *Rumbaugh* court found guidance in the statute's "broad policy to prevent fraudulent exploitation of the investing public." *Id.* at 784. *See also Siporin v. Carrington*, 23 P.3d 92, 97–99 (Ariz. Ct. App. 2001) (concluding that similar investments were "investment contracts" because "[t]he pre-sale activities resulted in the determination that the viatical settlements that Carrington sold would be profitable. Indeed, no one disputes that Carrington's efforts were 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'") (citing *Turner Enters.*, 474 F.2d at 482); *Michelson v. Voison*, 658 N.W.2d 188, 190 (Mich. Ct. App. 2003) (deferring to administrative decision implementing *Siporin*'s holding in applying Michigan's investment-contract statute); *Poyser v. Flora*, 780 N.E.2d 1191, 1196–97 (Ind. Ct. App. 2003) (adopting rule from and quoting extensively from *Siporin*).

27

developer defendant that the Texarkana court had concluded did not promote "investment contracts" in *McConathy*, 545 S.W.2d at 873. Although the land developer had engaged in pre-purchase efforts, such as "'investigat[ing] the location, zoning and price to fair market value ratio' of real estate before organizing and selling joint ventures in the property," the Texarkana court held that the developer "did not undertake managerial efforts that would affect the profitability of a venture." *Griffitts*, 2004 WL 1178418, at *2 (quoting *McConathy*, 545 S.W.2d at 873). Instead, "in such a case the enhancement in the value of the land took place by virtue of 'its location and the normal appreciation of neighborhood land values,' and not because of any efforts by the promoters." *Id*. (quoting *McConathy*, 545 S.W.2d at 875). Citing the D.C. Circuit's *Life Partners* decision and analogizing to the facts of *McConathy*, the Waco court concluded that "the profitability of Griffitts's interests in life insurance policies is not determined by any managerial efforts on the part of Life Partners, but is determined by the mortality of the insureds." *Griffitts*, 2004 WL 1178418, at *2 (citing *Life Partners,* 87 F.3d at 545–46).

The following year, however, the Eleventh Circuit Court of Appeals reached the opposite conclusion in *S.E.C. v. Mutual Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005). Expressly "declin[ing] to adopt the test established by the [D.C. Circuit] *Life Partners* court," the Eleventh Circuit rejected the notion that *Howey* "require[s] such a clean distinction between a promoter's activities prior to his having use of an investor's money and his activities thereafter." *Mutual Benefits Corp.*, 408 F.3d at 743. Noting that the Supreme Court's precedent "directs us to broadly apply" the statutes "to all 'schemes devised by those who seek the use of the money of others on the promise of profits,'" and relying in part on the D.C. Circuit's dissenting opinion,[15] the court

---

[15] Like the D.C. Circuit's dissenting judge, the Eleventh Circuit disagreed that there was no precedent in which courts relied on "the pre-purchase exercise of expertise by promoters in selecting or negotiating the price of an asset in which investors would acquire an interest." *Id*. at 743–44 (citing *S.E.C. v. Eurobond Exch., Ltd.*, 13 F.3d 1334 (9th Cir.1994) (involving interests in foreign treasury bonds); *Gary Plastic*, 756 F.2d 230 (involving interests in

concluded that "there is no basis for excluding pre-purchase managerial activities from the analysis." *Id*. (citing *Life Partners*, 87 F.3d at 551 (Wald, J., dissenting)).

The Eleventh Circuit went on to conclude that, in that case, the purchasers "relied heavily" on both pre-purchase and post-purchase "efforts of the promoters in making investments in viatical settlement contracts profitable." *Id*. at 744. Regarding pre-purchase efforts, the court found that the promoters "selected the insurance policies in which the investors' money would be placed," "bid on policies and negotiated purchase prices with the insureds," "determined how much money would be placed in escrow to cover payment of future premiums," and "undertook to evaluate the life expectancy of the insureds—evaluations critical to the success of the venture." *Id*. If the promoter "underestimated the insureds' life expectancy," the court noted, "the chances increased that the investors would realize less of a profit, or no profit at all." *Id*. And regarding the promoter's post-purchase efforts, the court concluded that these were also "important" and "managerial," because, "[o]ften, life-expectancy evaluations were not completed until after closing," and the promoter "assumed the responsibility of making premium payments" and "collectively managed [the payments] in such a manner that investors were not required to pay additional premiums." *Id*.

By comparison, the court explained, the purchasers performed no managerial tasks other than selecting the terms of the policies in which they invested: they "had no ability to assess the accuracy of [the promoter's] representations . . . or the accuracy of the life-expectancy evaluations," and "[t]hey could not, by reference to market trends, independently assess the prospective value of their investments in [the] viatical settlement contracts." *Id*. Because the "investors relied on both the pre- and post-purchase management activities of [the promoter] to

---

certificate of deposit program); *Glen–Arden*, 493 F.2d 1027 (involving investments in warehouse receipts for whiskey)).

29

maximize the profit potential of investing in viatical settlement contracts," the court concluded

that the promoter "thus offered what amounts to a classic investment contract." *Id*.

## D.     The Texas Test, Clarified and Confirmed

As we have discussed, many courts throughout the country have addressed the meaning of

"investment contract," and several have even addressed whether life settlement agreements are

investment contracts. In Texas, the Texarkana court held in 1976 that the purchase of an interest

in a venture to hold a tract of land "for investment and capital appreciation" was not an "investment

contract" because the "evidence shows only that the parties joined together to purchase land and

hold it for possible appreciation in value." *McConathy*, 545 S.W.2d at 875. This Court then

addressed the issue and adopted the *Howey/Forman* test in *Searsy*, in which we held that the

purchase of commodity options was an investment contract even though "the final decision was

left to the customer," because in reality the customer "rarely had any choice but to follow the

advice given him." *Searsy*, 560 S.W.2d at 641.

After *Searsy*, a few Texas courts addressed the issue under facts similar to *McConathy*,

where the purpose of the enterprise was to acquire and sell a tract of land, and those courts reached

different results depending on the facts of each case.[16] Twenty-seven years after *Searsy*, the Waco

court held that Life Partners' life settlement contracts are not investment contracts because "the

---

[16] *See, e.g.*, *Cross v. DFW S. Entry P'ship*, 629 S.W.2d 860, 864 (Tex. App.—Dallas 1982, no writ) (concluding no investment contract because purchaser "failed to show that any managerial or entrepreneurial services were expected of [defendant] in [purchaser's] re-sale or development of the property"); *Mayfield v. Troutman*, 613 S.W.2d 339, 343 (Tex. Civ. App.—Tyler 1981, writ ref'd n.r.e.) (distinguishing *McConathy* and *Wilson* and holding that limited partnership interests in a partnership created to buy and sell a tract of land were "investment contracts" because the general partner "actively sought buyers for the property," "showed it several times to many brokers and people," and "investigated the value of surrounding property in order to determine a price for the partnership property," and thus "did indeed act in a 'managerial' capacity and was solely responsible for making the significant decisions affecting the success of [the partnership]"); *Wilson v. Lee*, 601 S.W.2d 483, 484 (Tex. Civ. App.—Dallas 1980, no writ) (adopting *McConathy*'s reason and holding "that a joint venture interest in raw land, purchased by investors whose sole expectations of profit or appreciation rests upon market inflation and not upon the managerial or entrepreneurial efforts of others, was not a 'security' under the Securities Act").

profitability of [the] interests in life insurance policies is not determined by any managerial efforts on the part of Life Partners, but is determined by the mortality of the insureds." *Griffitts*, 2004 WL 1178418, at \*2 (citing *Life Partners*, 87 F.3d at 545–46). And then the Dallas and Austin courts rejected the Waco court's approach in the two cases we address today. 416 S.W.3d at 592; ___S.W.3d at ___.

Having reviewed both the statute's language and the extensive authorities from Texas and throughout the country, we now confirm and clarify, *first*, that the Texas Securities Act's definition of "securities" must be construed broadly to maximize the protection it provides to investors, while focusing on the economic realities of the transaction regardless of any labels or terminology the parties may have used. The Act itself expressly supports this approach. *See* TEX. REV. CIV. STAT. art. 581-10-1.B ("This Act may be construed and implemented to effectuate its general purposes to protect investors . . . ."); *id.* art. 581-10-1.A ("This Act may be construed and implemented to effectuate its general purpose to maximize coordination with federal and other states' law and administration . . . .").

*Second*, in light of these guiding principles and consistent with the uniform constructions of the precedents we have discussed, we confirm and clarify that an "investment contract" for purposes of the Texas Securities Act means a contract, transaction, or scheme through which a person pays money to participate in a common venture or enterprise with the expectation of receiving profits, under circumstances in which the failure or success of the enterprise, and thus the person's realization of the expected profits, is at least predominately due to the entrepreneurial or managerial, rather than merely ministerial or clerical, efforts of others.

And *third*, we hold that the entrepreneurial or managerial efforts that are relevant to this inquiry, whether those of the purchasers or of others, include those that are made prior to the

31

transaction as well as those that are made after. We reach this conclusion in light of the guiding principles we have identified, because we agree that the "bright-line rule" dismissing the relevance of pre-purchase efforts "elevates a formal element, timing, over the economic reality of the investors' dependence on the promoter [and] undercuts the flexibility and ability to adapt to 'the countless and variable schemes' that are the hallmarks of the *Howey* test." *Life Partners*, 87 F.3d at 551 (Wald, J., dissenting).

In reaching this conclusion, we are not persuaded by the argument that the Act's protections are unnecessary when the entrepreneurial or managerial efforts occur before the transaction because the value of those efforts is incorporated into the purchase price. *See, e.g.*, *id*. at 545–47. The Act protects investors against a promoter's harmful conduct before a sale of securities, as well as after. *See, e.g.*, TEX. REV. CIV. STAT. art. 581-7.A (requiring permit and registration before offering to sell a security), art. 581-7.B(2)(c) (authorizing Commissioner to act against misleading facts "at any time, before or after registration of securities); art. 581-9 (providing protection in response to an offer to sell securities); art. 581-22 (regulating offers to sell securities); art. 581-33 (imposing liability for misleading offers to sell a security). We reject the argument that only post-purchase conduct should determine whether these pre-purchase protections apply. We agree that the Act's disclosure requirements provide protection if the purchaser relies predominately on the entrepreneurial or managerial efforts of others to receive the anticipated profit, rather than on market forces or on the purchaser's own efforts, even if those efforts occur before the sale. *See Life Partners*, 87 F.3d at 552 (Wald, J., dissenting) (citing *S.E.C. v. G. Weeks Sec., Inc.*, 678 F.2d 649, 652 (6th Cir. 1982)).

We are also not persuaded by the concern that the consideration of pre-purchase efforts will transform every traditional land acquisition or purchase for use or consumption into an

"investment contract," because we believe the various aspects of the definition we have provided are sufficient to ensure that the transaction in question is the type of "investment contract" the Act aims to address. The transaction must involve the payment of money, a common enterprise, the expectation of profits, and dependence *predominately* on the entrepreneurial or managerial efforts of others to achieve the anticipated profits, and this test "can be met by pre-purchase managerial activities of [others only] when it is the success of these activities, either entirely or predominantly, that determines whether profits are eventually realized." *Id.* at 551 (Wald, J., dissenting).

The State suggests that we add additional requirements to this test, allowing, for example, for the consideration of pre-purchase efforts only if the promoter or third party also retains some continuing post-purchase obligations, such as an obligation to assist the purchaser in selling or redeeming the investment in the future. *See, e.g.*, *Glen-Arden*, 493 F.2d at 1032 (noting that purchasers relied on promoters to redeem investments because there was no secondary market for interests in whiskey). We decline to do so. While reliance on such efforts may certainly be relevant to whether a transaction is an investment contract, the key question is not when the efforts of others take place, but whether they are entrepreneurial or managerial efforts that affect the failure or success of the enterprise. The relevance to the Act's purpose to protect investors is not the timing of the efforts but the efforts' role in the transaction as the factor on which the investor predominately relies.

## E.      Life Partners' Life Settlement Agreements

Applying this definition to Life Partners' life settlement agreements, we conclude based on the undisputed material facts that they are investment contracts, and thus securities, under the Texas Securities Act. The parties do not dispute that the agreements are a transaction through which the purchasers pay money to participate in a common enterprise with the expectation of

33

receiving profits. Life Partners contends, however, that the failure or success of the enterprise, and thus the purchaser's realization of the expected profits, does not depend on the entrepreneurial or managerial efforts of Life Partners or others.

We disagree. Life Partners is the facilitator and administrator of the investments in life settlements through its Power of Attorney. It identifies the insured, negotiates the discount for the policy, evaluates the policy's terms and conditions, and evaluates the health of the insured. It purchases the policy and finds purchasers to buy an interest in the policy until all interests are sold. These pre-purchase efforts require Life Partners to accurately evaluate the insured's life expectancy and to set the correct purchase price (the discount) to yield a profit based on the insured's life expectancy, future premiums, and end-value of the policy's benefits. If Life Partners' prediction is accurate, the purchaser will receive a profit. Life Partners acknowledges that its purchasers "depend upon [Life Partners'] ability to predict life expectancies and set the appropriate prices," and even the D.C. Circuit's majority agreed that Life Partners' pre-purchase entrepreneurial efforts are "undeniably essential to the overall success of the investment." *Life Partners*, 87 F.3d at 547. We agree.

Moreover, Life Partners' significant managerial efforts do not end when the sale transaction occurs. We do not agree with Life Partners' characterization of its post-purchase efforts as merely ministerial acts that serve only to preserve and protect the investment. *See McConathy*, 545 S.W.2d at 875 ("The only management on the part of the managing venturer . . . was that of insuring the property, paying the taxes and the like—not for profit, but solely to protect and preserve the investment."). As we and other courts have explained, "managerial" efforts, as opposed to ministerial efforts, are actions through which the person exercises oversight, discretion, and control over activities and transactions on which the anticipation of profits depends. *See*

34

*Searsy*, 560 S.W.2d at 641; *Howey*, 328 U.S. at 294, 300 (concluding the promoter "manage[d], control[ed], and operate[d] the enterprise"); *see also Wieboldt*, 355 F. Supp. at 261 (concluding that the purchaser's "given role was not essentially ministerial, but truly active and discretionary" and "gave him virtually unfettered control, a situation which is irreconcilable . . . with *Howey*'s definition of an investment contract"); *Schultz Cattle Co.*, 881 F.2d at 134, 136; *Bailey*, 904 F.2d at 923; *cf. McConathy*, 545 S.W.2d at 876 (establishing that investors had control over the investment). To decide whether efforts are managerial, we must look to the substance and economic realities of the transactions. *Forman*, 421 U.S. at 851.

Here, after the purchase, Life Partners exercises complete control and discretion over the investment and the investment's success. It holds legal title to the policy, monitors the insured and the policy premium payments, and collects and distributes the necessary funds. It uses its discretion to project the amount necessary to place in escrow to cover the premiums, and is responsible for notifying purchasers if additional premiums are required because an insured survives beyond Life Partners' predicted life expectancy. In its discretion, Life Partners advances premiums if the purchaser cannot make the additional payments, and may optimize premiums to protect and maximize the value of the escrowed funds. Life Partners' failure to properly project and maintain premiums will result in forfeiture of the policy, and therefore, the investor's profits.

In addition, Life Partners has complete control over all efforts to monitor the insureds and their health status, and the purchasers are unable to do so because of privacy requirements. When the insured dies, Life Partners must obtain the death certificate, complete required insurance forms, and ensure that the purchasers receive their pro-rata share of the benefits. Life Partners (or its designated trustee) is the only party that may cash out the policy and is responsible for timely filing the insurance forms. Additionally, Life Partners solely manages the policy payout by dividing and

distributing it according to each investor's pro-rata share, using information that only Life Partners can access.

The purchasers have neither the power to complete these tasks nor the information necessary to do so, yet they can lose some or all of their anticipated profits if Life Partners fails to perform as it has agreed. Even Life Partners acknowledges that purchasers rely on it both before and after the interest is purchased. Life Partners' efforts are not merely ministerial efforts like paying taxes to preserve an investment, *see McConathy*, 545 S.W.2d at 875, because Life Partners has complete control over the investment and uses its discretion and control to properly manage the investment and produce a profit. Without Life Partners' managerial efforts, the investments would fail. Under these facts, we conclude that Life Partners' post-purchase efforts are managerial, not ministerial. Life Partners manages and controls the entire enterprise, from start to finish, both before the transaction and after. We conclude, therefore, on the undisputed material evidence in this record, that Life Partners' life settlement agreements are investment contracts, and thus securities, under the Texas Securities Act.

### III.
### "Retroactive" Application

Conditionally and alternatively, Life Partners requests that we give our holding only prospective effect, and thus alleviate Life Partners from any liability to the Arnolds or the State in these cases based on its prior conduct. In support, Life Partners notes that the Waco court's 2004 decision in *Griffitts* was the only relevant Texas case until the Dallas Court of Appeals' 2013 decision in *Arnold*, and contends it should not be subjected to the Securities Act's strict liability when it was reasonably relying on that decision. In addition, Life Partners suggests that a "retroactive" application of our decision would violate the Texas Constitution's prohibition against retroactive laws and several provisions of the federal Constitution.

36

In support of its request, Life Partners relies on the Supreme Court's decision in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), and our decision in *Carrollton–Farmers Branch Independent School District v. Edgewood Independent School District*, 826 S.W.2d 489, 492, 515 (Tex. 1992) ("*Edgewood III*"), to apply the holdings in those cases prospectively only. In *Chevron*, the Supreme Court articulated a three-part analysis for deciding whether to give a holding only prospective relief:

– First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.

– Second, [the court] must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.

– Finally, [the court must] weig[h] the inequity imposed by retroactive application, for where a decision of [the court] could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity.

404 U.S. at 106–07 (citations and quotations omitted).

We adopted the *Chevron* test in *Edgewood III* and elected to apply our decision in that case declaring the State's public school finance system unconstitutional prospectively only. 826 S.W.2d at 521. Considering the first *Chevron* factor, we noted that we had decided an "issue of first impression" and that there was "a dearth of caselaw interpreting the constitutional provisions in issue, and none of those cases involve circumstances like those presented in this case." *Id*. at 520. Addressing the second factor, we noted that the "rule in question" was "not a simple one because more than one constitutional provision [was] involved." *Id*. But the effect of our ruling was to find provisions of recently enacted Senate Bill 351 to be unconstitutional, and because the State's public school districts had already been collecting taxes as that bill authorized, we acknowledged

37

that a retroactive application of our decision would "require a refund of those taxes, [and] the effect upon the school system would be devastating" and "so damaging to the school system it could not further any purpose of the Constitution." *Id.* at 520–21. Similarly, addressing the third factor, we concluded that retroactive application would cause "serious disruption in the education of Texas' children." *Id.* at 521.

Applying the *Chevron* factors here, we reach the opposite result. First, our decision in this case does not "establish a new principle of law" by "overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." The Texas Securities Act has existed since 1957, and in 1977 we announced in *Searsy* that we must look to federal cases and other authorities, which "broadly construe" the term "investment contract." 560 S.W.2d at 639. For decades, as we have explained, federal courts and state courts have affirmed and followed the three guiding principles and the definition we have described today. If any principle of law is new, it is the principle that the relevant "efforts of others" include pre-purchase efforts, yet the Eleventh Circuit announced that holding more than ten years ago. *Mutual Benefits Corp.*, 408 F.3d 737.

Moreover, although the Waco Court of Appeals held to the contrary the prior year, we do not agree that the *Griffitts* decision makes today's decision "new." As a rule, court decisions apply retroactively, and the *Chevron* test provides only an exception to that rule. *See State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 719 (Tex. 1996); *Elbaor v. Smith*, 845 S.W.2d 240, 250 (Tex. 1992); *Edgewood III*, 826 S.W.2d at 515; *Sanchez v. Schindler*, 651 S.W.2d 249, 254 (Tex. 1983). If we must apply decisions only prospectively any time we affirm a court of appeals judgment that conflicts with the previous holding of a different court of appeals, the exception would swallow the rule. And in any event, because the evidence here establishes that Life Partners' post-purchase

efforts were sufficient to meet the *Howey/Forman* test, our holding on the relevance of pre-purchase efforts is not "the rule in question" for purposes of the *Chevron* analysis.

Considering the remaining factors of the *Chevron* test, we believe that retroactive application of our holding furthers the operation and enforcement of the Securities Act, and in light of the decades of precedent on which we rely, the results impose no inequities on Life Partners. *See, e.g.*, *Bowen v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 100 (Tex. 1992) (per curiam) (holding that a prior decision should be given retroactive effect, even though it had overruled five different courts of appeals on a matter of statutory interpretation). And finally, in response to Life Partners' constitutional concerns, we need only note that our decision merely interprets and applies a very old law, consistent with the manner in which other courts have interpreted and applied it for decades; it does not create a new one.[17] We therefore decline to limit today's holding to prospective application.

## IV.

### "Relief Defendants"

Finally, we address the arguments of Advance Trust & Life Escrow Services, L.T.A., and Purchase Escrow Services, LLC, two Petitioners in *Life Partners, Inc. v. State*. The State sued these Petitioners as "relief defendants," seeking equitable relief "on the belief that they might hold property or assets belonging to Life Partners." *See S.E.C. v. George*, 426 F.3d 786, 798 (6th Cir. 2005) ("A relief defendant (sometimes referred to as a nominal defendant) may 'be joined to aid the recovery of relief' and 'has no ownership interest in the property which is the subject of litigation.'") (quoting *S.E.C. v. Cherif*, 933 F.2d 403, 414 (7th Cir.1991)); *S.E.C. v. Colello*, 139

---

[17] Life Partners cites *Landgraf v. USI Film Products*, 511 U.S. 244, 247–48 (1994) as support for its constitutional concerns, but the issue there was whether the newly passed Civil Rights Act of 1991 applied retroactively to a Title VII case then pending on appeal. *Id.* at 247. Here, we do not have a newly passed law but merely the interpretation of an existing law.

F.3d 674, 675–77 (9th Cir. 1998) (same). The trial court entered judgment in favor of these Petitioners as well as Life Partners, and on the State's appeal, Petitioners requested that the court of appeals affirm as to them because there was no evidence that "either of them 'held or retained' any property of Life Partners." ___S.W.3d at ___. The appeals court concluded that "these assertions are better suited for the district court's consideration on remand." *Id.* As it is not clear from the record whether the trial court granted judgment in favor of these Petitioners based on its evidentiary findings or on its legal conclusion that life settlement agreements are not securities, we agree with the court of appeals.

## V.
## Conclusion

We hold on this record that Life Partners' life settlement agreements are investment contracts, and thus securities, under the Texas Security Act. We decline to apply this holding prospectively only, and in light of our holding, we agree that the trial court should consider the relief defendants' arguments on remand. We affirm the judgments of the Third and Fifth District Courts of Appeals.

_____
Jeffrey S. Boyd
Justice

**Opinion Delivered**: May 8, 2015